## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In Re:

KERISHA NICOLE HENDERSON

       Debtor.

_____/

Chapter 7
Case No. 25–40582–mlo
Hon. Maria L. Oxholm

MICHIGAN DEPARTMENT OF HEALTH
AND HUMAN SERVICES,

       Plaintiff,

v.

KERISHA NICOLE HENDERSON,

       Defendant.

_____/

Adv. Pro. No. _____
Hon. Maria L. Oxholm

## COMPLAINT TO DETERMINE DISCHARGEABILITY
## OF DEBT UNDER 11 U.S.C. § 523(a)

Plaintiff, Michigan Department of Health and Human Services

(Department), by and through their attorney, Jessica Rundle, Assistant

Attorney General, objects to the discharge of the debt owed by

Defendant-Debtor Kerisha Nicole Henderson pursuant to 11 U.S.C.

§ 523(a), and Fed. R. Bankr. P. 7001(6), and state as follows:

## JURISDICTION

1.    Pursuant to 28 U.S.C. § 157 and 28 U.S.C. § 1334, this Court

has jurisdiction to determine the dischargeability of Henderson's debt

under 11 U.S.C. § 523(a).

2.    Venue is proper as provided by 28 U.S.C. § 1409(a).

3.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

4.    This is an action that seeks a determination that the debt

Henderson owes to the Department is non-dischargeable pursuant to

11 U.S.C. § 523(a)(2)(A).  Fed. R. Bankr. P. 4007(c).  *See also* Fed. R.

Bankr. P. 7001(6).

## GENERAL ALLEGATIONS

5.    The Department incorporates ¶¶ 1–4 by reference as if fully

restated.

6.     Henderson's bankruptcy address of record shows she is a

resident of Wayne County with a last known address of 23898 Barfield

St., Farmington, MI 48336.

7.    Henderson filed a Chapter 7 petition on January 22, 2025.

(Case No. 25-40582-mlo, ECF No. 1.)

8.     On February 13, 2026, this Court reopened Kerisha Henderson's bankruptcy case to allow the Department to file an adversary complaint to determine non-dischargeability of the debts owed to the Department.  (*Id.*, ECF No. 18.)

9.     The Medicaid program was created in 1965 through the enactment of Title XIX of the Social Security Act, 42 USC 1396 *et seq*. Federal regulations govern Medicaid and are found in 42 C.F.R. §§ 430–456.

10.     The Department is an agency of the state of Michigan, and among other duties is the lead agency for the administration of the state of Michigan's Medicaid program pursuant to Mich. Comp. Laws. § 400.1 *et. seq.*

11.     Michigan's Medicaid program allows, in relevant part, for personal care services (Home Help) to be provided to eligible beneficiaries to enable them to live safely in the most independent setting of their choice.  Mich. Comp. Laws § 400.14(1)(p).  *See also* 42 C.F.R. § 440.167.

12.     The Department makes Home Help services available through agreements entered into between eligible beneficiaries and

3

either Home Help agencies or individual providers.  Mich. Comp. Laws § 400.111b(4) (requiring provider to enter into enrollment agreement); 42 C.F.R. § 431.107.  *See also Adult Services Manual* 135, p. 13 (available at http://www.mfia.state.mi.us/olmweb/ex/html/).

13.    Prepetition, Henderson was the owner of First Alliance Home Care (First Alliance) and voluntarily enrolled First Alliance as a Home Help agency provider.  (Ex. 1, Home Help Provider Agreement.)

14.    As an agency provider,[1] Henderson agreed that "personal care services will be provided for a Michigan Medicaid Beneficiary, as authorized by the Michigan Department of [Health and] Human Services . . . ."  (Ex. 1, Home Help Provider Agreement, ¶ 3.)

15.    Pursuant to Mich. Comp. Laws § 400.111b(24), a provider is required to "satisfy or make acceptable arrangement[s] to satisfy all previous adjudicated program liabilities[.]"

---

[1] An "agency provider" is generally an approved agency with a federal taxpayer identification number "that directly employs all (but not less than two) agency caregivers, not including the owner, who are providing services through the Home Help program and regularly receiving a monthly paycheck." *Adult Services Manual* 136, p. 1.  An individual provider or caregiver provides home help services directly to the beneficiary without the involvement of an agency provider.

16.    Henderson explicitly agreed to "return any payments received from Home Help services not provided." (Ex. 1, Home Help Provider Agreement, ¶ 5.) *See also* Mich. Comp. Laws § 400.105(4) ("provider" includes an individual); Mich. Comp. Laws § 400.111b(6), (8), (16) (collectively these subsections require a Medicaid "provider" to retain specific records for seven years and repay, return, restore, or reimburse the Department for overpaid-issued payments).

17.    Henderson, as an owner and administrator, was responsible for complying with the program requirements on behalf of First Alliance. (Ex. 2, *Adult Services Manual* 136 [May 1, 2023], p. 2.)

## DHHS – DEBT FOR OVERPAYMENT OF PAYROLL

18.    First Alliance was overpaid for payroll. Payroll review of payments made by Medicaid between January 1, 2018, to January 31, 2023 (the "Over-Issuance Period"), were compared to actual payroll issued to direct caregivers for the year. Several caregivers were paid less than what Henderson through First Alliance claimed on their behalf, resulting in MDHHS issuing overpayments to the agency.

19.    Adult Services Manual, ASM 165, Overpayment & Recoupment Process states, "[a]gency providers are responsible for

5

correct billing procedures. Agency providers must bill for hours and services delivered to the client that have been approved by the adult services worker. Agency providers are responsible for refunding overpayments resulting from an inaccurate submission of hours. Failure to bill correctly or refund an overpayment is an individual caregiver or agency provider error." (Ex. 3, *Adult Services Manual* 165, p. 2).

20. Because Henderson, through First Alliance, knowingly billed for more hours than were paid to direct caregivers, the Department overpaid $18,137.37 in Medicaid payments that Henderson and First Alliance were ineligible to receive.

## DHHS – DEBT FOR SERVICES NOT PROVIDED TO BENEFICIARY

21. Henderson, through First Alliance, received $4,263.67 in Medicaid payments involving beneficiaries that were receiving in-patient care at a medical facility.

22. Home Help agencies cannot bill for, and receive Medicaid reimbursement, for services that an employed direct caregiver did not actually provide to the beneficiary because the beneficiary was

6

unavailable due to admission to a medical facility.  (Ex. 4, *Adult Services Manual* 166, p. 2.)  *See also* Mich. Comp. Laws § 400.111e(3)(b); and Mich. Comp. Laws § 400.607(1).

23.    An agency provider commits an intentional program violation (i.e., fraud) when it "intentionally makes a false or misleading statement, hides or misrepresents/withholds facts to receive or to continue receiving benefits."  (Ex. 4, *Adult Services Manual* 166, p. 1.)

24.    Henderson, however, failed to notify the Department when the beneficiaries were receiving in-patient care at a medical facility during the Over-Issuance Period, and Henderson intentionally continued to request and accept Home Help payments for those periods when First Alliance was not eligible for payments because the direct caregivers employed by First Alliance could not have provided care while the beneficiaries were also receiving in-patient care.

25.    Since the direct caregivers First Alliance employed could not have provided care to the beneficiaries that were also receiving in-patient care, Henderson repeatedly and intentionally misrepresented First Alliance's eligibility for Home Help payments because Home Help services cannot be paid when a beneficiary is unavailable.

7

26. Based on Henderson's repeated and knowing misrepresentations, the Department issued Henderson, through First Alliance, $22,401.04 in Home Help payments during the Over-Issuance Period that they were not eligible to receive.

27. On July 31, 2024, Henderson signed a Repayment Agreement acknowledging the debt and agreeing to repayment terms with the Department. (Exhibit 5, Repayment Agreement, 7/31/2024.)

28. In May, 2025, a state circuit court judgment was entered against both First Alliance and Henderson after Henderson failed to comply with the Repayment Agreement. (Exhibit 6, Judgment, 5/6/2025.)

## COUNT I: 11 U.S.C. § 523(a)(2)(A)

29. The Department incorporates by reference ¶¶ 1–28 as if fully restated.

30. The Department may obtain a determination of dischargeability regarding a kind of debt specified in § 523(a)(2)(A). Fed. R. Bankr. P. 4007(c).

31. Henderson was an owner and person responsible for seeking Medicaid Home Help payments on behalf of First Alliance. (Ex. 1,

Provider Agreement, ¶ 5.) *See also* Mich. Comp. Laws § 400.111b(24) (provider agrees to satisfy all previous adjudicated liabilities under Medicaid program).

32.     When Henderson requested Medicaid reimbursements on behalf of First Alliance, she intentionally, or with reckless disregard as to the truth, repeatedly misrepresented to the Department that caregivers were providing more hours of care than caregivers were paid for.

33.     And Henderson, through First Alliance, intentionally and knowingly misrepresented to the Department that Home Help services were provided to several beneficiaries that were admitted to a medical facility for in-patient care and thus unavailable for Home Help services.

34.     Home Help services cannot be paid when the beneficiary is unavailable. *Adult Services Manual* 166, p. 2. *See also Adult Services Manual* 165, p. 2 ("Individual caregivers and agency providers must bill for hours and services delivered to the client that have been approved by the adult services worker.  Individual caregivers and agency providers are responsible for refunding overpayments resulting from an inaccurate submission of hours.").

35.     Henderson intentionally, or with reckless disregard as to the truth, repeatedly misrepresented to the Department that First Alliance was eligible for Medicaid Home Help payments by accepting reimbursements for more caregiver hours than were paid to employees, and for when beneficiaries were unavailable because they were receiving in-patient care.

36.     Henderson knew or should have known that First Alliance was not eligible for Home Help payments because Henderson agreed in writing to "report any changes relative to the beneficiary, including but not limited to hospitalizations, nursing home stays or discontinuation of services[,]" and to return any payments for services not provided.  (Ex. 1, Home Help Provider Agreement, ¶¶ 5, 12.)  *See also* Mich. Comp. Laws § 400.111b(24).

37.     Because of Henderson's intentional and knowing misrepresentations, the Department overpaid First Alliance Medicaid payments that it was ineligible to receive.  As the owner of First Alliance, Henderson personally benefited from the $22,401.04 in overpayments.

38.    Had Henderson not mispresented First Alliance's eligibility for Home Help payments, the Department would not have overpaid First Alliance the $22,401.04 in Medicaid payments.

39.    The Department justifiably relied on Henderson's intentional and false misrepresentations regarding First Alliance's eligibility for Home Help payments.

40.    Based on the Department's reliance, it provided First Alliance with Home Help program payments that each was not entitled to receive.

41.    Henderson, as an owner of First Alliance, is personally liable for the overpayment because of her active participation in misrepresenting First Alliance's eligibility for Home Help payments. *Citizens Ins. Co. of Am. v. Delcamp Truck Ctr., Inc.*, 444 N.W.2d 210, 213 (Mich. Ct. App. 1989).

42.    Similar to other cases, Henderson's debt to the Department is non-dischargeable because Henderson intentionally used First Alliance to induce the Department to overpay $22,401.04 in Medicaid payments neither was eligible to receive.  *See Brady v. McAllister* (*In re Brady*), 101 F.3d 1165, 1172 (6th Cir. 1996) (a debtor who fraudulently

induces a loan to a corporation that he controls may be liable for purposes of § 523[a][2][A]). *See also Cash Am. Fin. Servs., Inc. v. Fox* (*In re Fox*), 370 B.R. 104, 113 (B.A.P. 6th Cir .2007) (corporate officer may be personally liable for corporation's tort if he was personally involved in tort's commission); and *In re Jones*, 585 B.R. 465, 504 (Bankr. E.D. Tenn. 2018) (debtor held personally liable for corporate debt because he was sole shareholder and made livelihood from corporation).

43.     Henderson's intentional actions caused her, through First Alliance, to obtain money or benefits from the Department through false pretenses, false representations, and actual fraud contrary to 11 U.S.C. § 523(a)(2)(A).

## CONCLUSION AND REQUEST FOR RELIEF

WHEREFORE, the Michigan Department of Health and Human Services requests that this Court enter an Order as follows:

A.     Enter a money judgment against Defendant Kerisha Henderson in favor of the Michigan Department of Health and Human Services in the total amount of $6,197.78 (current balance owing), plus court filing costs in accordance with law; and

12

B.     Enter an order determining that the debt owed by

Defendant Kerisha Henderson to the Michigan Department of Health

and Human Services in the amount of $22,401.04 is non-dischargeable

pursuant to 11 U.S.C. § §523(a)(2)(A); and

C.     Any other further relief as this Court deems appropriate.


Respectfully submitted,


/s/ *Jessica L. Rundle*
Jessica L. Rundle
Assistant Attorney General
Attorney for Michigan
Department of Health and
Human Services
Michigan Department of
Attorney General
Revenue and Tax Division
P.O. Box 30758
Lansing, MI  48909
(517) 335–7584
RundleJ1@michigan.gov
P83788

Dated:  February 26, 2026

# Exhibit 1

**Report Date:** 05/10/2023
10:05:22 AM

 Michigan Department of Health and
Human Services

Print Terms and Conditions Report

Modification Submission



| Provider ID | SSO ID | SSO First Name | SSO Last Name | NPI | Provider Name | Submission Date |
|---|---|---|---|---|---|---|
| ▮▮▮ | ▮▮▮ | Kerisha | Williams | | FIRST ALLIANCE HOME CARE | 12/18/2017 |
| **Terms and Conditions** | | | | | | |

Terms and Conditions Atypical Enrollment

Participation as Home Help Provider

1. As an individual provider of Home Help services, I agree that the Medicaid beneficiary is considered the employer. I am not employed by the Michigan Department Of Health and Human Services (MDHHS), the Department of Human Services (DHS), or the State of Michigan.

2. As a Home Help provider agency, I agree that the agency contract is with the Medicaid beneficiary. The agency contract is not with the Michigan Department Of Health and Human Services (MDHHS), the Department of Human Services or the State of Michigan.

3. I agree that personal care services will be provided for a Michigan Medicaid beneficiary, as authorized by the Michigan Department of Human Services (DHS) according to the DHS Adult Services Comprehensive Assessment.

4. Under Section 3504 of the Internal Revenue Code, I agree to accept the Michigan Department Of Health and Human Services (MDHHS) as the acting agent of the beneficiary for the deduction of withholding of FICA taxes. I understand that federal, state and city taxes are not withheld. I further agree to accept payments issued by MDHHS as payment in full and not to seek or accept additional payments from the beneficiary or any other source.

5. I agree to return any payments received for Home Help services not provided. I understand that accepting payment for services I did not provide is fraudulent and could result in criminal charges.

6. I understand that the Home Help program is funded by Medicaid and payments will not be approved by the Department if the beneficiary's Medicaid eligibility is inactive.

7. In order to receive payment, I agree to keep and submit to MDHHS, DHS or their designee, any and all records necessary to disclose the extent of services provided to the beneficiary.

8. Upon request, I agree to provide MDHHS, DHS or their designee, any information regarding services or purchases for which payment was made.

9. Upon request, I agree to provide MDHHS, DHS or their designee, any business transaction information as specified by 42 CFR 455.105.

10. I understand I will be subject to a criminal history screening and may not qualify to be a home help provider.

11. I agree to cooperate with MDHHS, DHS or their designee, regarding any audits, investigations or inquiries related to Home Help services provided.



12.I agree to report any changes relative to the beneficiary including but not limited to hospitalizations, nursing home stays or discontinuation of services.

13.I agree to comply with the privacy, security and confidentiality provisions of all applicable laws governing the use and disclosure of protected health information (PHI), including the privacy regulations adopted by the U.S. Department of Health and Human Services under the Health Insurance Portability and Accountability Act of 1996 (HIPAA), and Public Acts 104–191 (45 CFR parts 106 and 164, Subparts A, C, and E).

14.I agree to comply with the provisions of 42 CFR 431.107 and Act No. 280 of the Public Acts of 1939, as amended, which state the conditions and requirements under which participation in the Medical Assistance Program is allowed.

Participation as Non-Emergency Transportation Provider

Definitions:

Confidential Rider Information: Includes, but is not limited to, the rider's medical record, any information provided by a health care provider, any other personally identifying information, and any information about the time of travel, destination, or pick up location.
Department means the Michigan Department of Health and Human Services.
Driver means an individual providing Non-Emergency Medical Transportation.
Rider means the individual being transported by driver.
Service means the provision by driver of Non-Emergency Medical Transportation for rider.

Terms:

Driver agrees to abide by the following terms and conditions:

1.To act in a professional manner at all times while providing services.

2.To never make comments that are sexually explicit in nature, solicit sexual favors, or engage in sexual activity with ride.

3.To never solicit or accept controlled substances, alcohol, or medication from rider.

4.To never solicit or accept money from riders.

5.To never use alcohol, narcotics, or controlled substances, or be under their influence, while providing services to riders. Prescribed medications can be used by a driver as long as his or her duties can still be performed in a safe manner and driver has written documentation from a treating physician that the medication does not impact the ability to drive.

6.To never eat or consume any beverage while operating the vehicle or while involved in rider assistance.

7.To never smoke in the vehicle when rider is present. For purposes of this agreement, "smoke" includes electronic

**Report Date:** 05/10/2023
10:05:22 AM

 Michigan Department of Health and
Human Services

Print Terms and Conditions Report

Modification Submission



cigarettes and any other product or device which emits vapor, smoke, or any similar gaseous matter of any kind.

8.To never wear any type of headphone while providing the service.

9.To be responsible for rider's personal items.

10.To provide, as appropriate to the needs of the rider, assistance with exiting the vehicle, to open and close vehicle doors when passengers enter or exit the vehicle, and to provide assistance as necessary to or from the main door of the place of destination.

11.To properly identify and announce their presence at the entrance of the building at the specified pick-up location if a curbside pick-up is not apparent, or with attending facility staff.

12.To assist the passengers in the process of being seated, including the fastening of the seat belt, when necessitated by the rider's condition.

13.To confirm, prior to allowing any vehicle to proceed, that all passengers are properly secured in their seat belts, car seats, and, when applicable, that wheelchairs and passengers who use wheelchairs are properly secured (Exception: Only a passenger who has a letter, carried on his/her person and signed by the passenger's physician, stating that the passenger's medical condition prevents the rider from using a seat belt, may be transported without a fastened seat belt and then only as allowed by state law).

14.To provide an appropriate level of assistance to passengers, when requested, or when necessitated by a passenger's condition.

15.To provide support and direction to passengers. Such assistance shall also apply to the movement of wheelchairs and mobility-limited persons as they enter or exit the vehicle using the wheelchair lift/ramp, as applicable. Such assistance shall also include stowage by the driver of mobility aids and folding wheelchairs.

16.To act in a professional manner at all times while providing services.

17.To be clean and maintain a neat appearance at all times.

18.To be polite and courteous to riders; riders shall be treated with respect and in a culturally appropriate manner when receiving transportation services. The Manager should notify the volunteer driver of any known cultural issues significant to providing transportation services.

19.To limit review of any confidential rider information to the minimum information necessary to provide the service.

20.To only use or record confidential rider information as necessary to provide the Department information necessary for the administration of the program (i.e. mileage reimbursement, if applicable).

**Report Date:** 05/10/2023
10:05:22 AM

 Michigan Department of Health and
Human Services

Print Terms and Conditions Report

Modification Submission



21. To not to retain any original or copy of any document rider shares with you for purposes of transport.

22. To not to retain any original or copy of any document that may be provided by a health care provider to driver. Driver agrees to ensure that such documentation leaves with rider.

23. To report any breach of the terms of this user agreement to the Department. This includes, but is not limited to, accidental retention of medical record or other confidential rider information.

24. To return to the Department, as soon as possible, but in no event later than 3 business days after discovery, any confidential rider information retained left with driver after completing transport of the rider.

25. To never discuss, write, or share in any other format any information specific to a rider, except as necessary to communicate with the Department or with a health care provider or other staff at a facility rider is being transported to.

26. Not input or include any confidential rider information in any computer system of any kind, except as approved by the Department. This includes personal email accounts, file transfer systems, note applications, and any other electronic system of recording data not expressly approved for use by the Department.

27. Comply with any other agreements driver has entered into with respect to this program.

28. Respect the rider's privacy by not asking for more information about the individual's condition, reason for visit, or other personal information, while providing transport services. If the rider chooses to voluntarily share this information, it is subject to the same protections described above regarding protecting rider information.

☑ By checking this, I certify that I have read and that I agree and accept the enrollment conditions in the Medical Assistance Provider Enrollment & Trading Partner Agreement.



| Provider ID | SSO ID | SSO First Name | SSO Last Name | NPI | Provider Name | Submission Date |
|---|---|---|---|---|---|---|
| ▉ | ▉ | Kerisha | Williams | | FIRST ALLIANCE HOME CARE | 10/15/2018 |
| **Terms and Conditions** | | | | | | |

Terms and Conditions Atypical Enrollment

Participation as Home Help Provider

1. As an individual provider of Home Help services, I agree that the Medicaid beneficiary is considered the employer. I am not employed by the Michigan Department Of Health and Human Services (MDHHS), the Department of Human Services (DHS), or the State of Michigan.

2. As a Home Help provider agency, I agree that the agency contract is with the Medicaid beneficiary. The agency contract is not with the Michigan Department Of Health and Human Services (MDHHS), the Department of Human Services or the State of Michigan.

3. I agree that personal care services will be provided for a Michigan Medicaid beneficiary, as authorized by the Michigan Department of Human Services (DHS) according to the DHS Adult Services Comprehensive Assessment.

4. Under Section 3504 of the Internal Revenue Code, I agree to accept the Michigan Department Of Health and Human Services (MDHHS) as the acting agent of the beneficiary for the deduction of withholding of FICA taxes. I understand that federal, state and city taxes are not withheld. I further agree to accept payments issued by MDHHS as payment in full and not to seek or accept additional payments from the beneficiary or any other source.

5. I agree to return any payments received for Home Help services not provided. I understand that accepting payment for services I did not provide is fraudulent and could result in criminal charges.

6. I understand that the Home Help program is funded by Medicaid and payments will not be approved by the Department if the beneficiary's Medicaid eligibility is inactive.

7. In order to receive payment, I agree to keep and submit to MDHHS, DHS or their designee, any and all records necessary to disclose the extent of services provided to the beneficiary.

8. Upon request, I agree to provide MDHHS, DHS or their designee, any information regarding services or purchases for which payment was made.

9. Upon request, I agree to provide MDHHS, DHS or their designee, any business transaction information as specified by 42 CFR 455.105.

10. I understand I will be subject to a criminal history screening and may not qualify to be a home help provider.

11. I agree to cooperate with MDHHS, DHS or their designee, regarding any audits, investigations or inquiries related to Home Help services provided.



12.I agree to report any changes relative to the beneficiary including but not limited to hospitalizations, nursing home stays or discontinuation of services.

13.I agree to comply with the privacy, security and confidentiality provisions of all applicable laws governing the use and disclosure of protected health information (PHI), including the privacy regulations adopted by the U.S. Department of Health and Human Services under the Health Insurance Portability and Accountability Act of 1996 (HIPAA), and Public Acts 104-191 (45 CFR parts 106 and 164, Subparts A, C, and E).

14.I agree to comply with the provisions of 42 CFR 431.107 and Act No. 280 of the Public Acts of 1939, as amended, which state the conditions and requirements under which participation in the Medical Assistance Program is allowed.

Participation as Non-Emergency Transportation Provider

Definitions:

Confidential Rider Information: Includes, but is not limited to, the rider's medical record, any information provided by a health care provider, any other personally identifying information, and any information about the time of travel, destination, or pick up location.
Department means the Michigan Department of Health and Human Services.
Driver means an individual providing Non-Emergency Medical Transportation.
Rider means the individual being transported by driver.
Service means the provision by driver of Non-Emergency Medical Transportation for rider.

Terms:

Driver agrees to abide by the following terms and conditions:

1.To act in a professional manner at all times while providing services.

2.To never make comments that are sexually explicit in nature, solicit sexual favors, or engage in sexual activity with ride.

3.To never solicit or accept controlled substances, alcohol, or medication from rider.

4.To never solicit or accept money from riders.

5.To never use alcohol, narcotics, or controlled substances, or be under their influence, while providing services to riders. Prescribed medications can be used by a driver as long as his or her duties can still be performed in a safe manner and driver has written documentation from a treating physician that the medication does not impact the ability to drive.

6.To never eat or consume any beverage while operating the vehicle or while involved in rider assistance.

7.To never smoke in the vehicle when rider is present. For purposes of this agreement, "smoke" includes electronic


cigarettes and any other product or device which emits vapor, smoke, or any similar gaseous matter of any kind.

8.To never wear any type of headphone while providing the service.

9.To be responsible for rider's personal items.

10.To provide, as appropriate to the needs of the rider, assistance with exiting the vehicle, to open and close vehicle doors when passengers enter or exit the vehicle, and to provide assistance as necessary to or from the main door of the place of destination.

11.To properly identify and announce their presence at the entrance of the building at the specified pick-up location if a curbside pick-up is not apparent, or with attending facility staff.

12.To assist the passengers in the process of being seated, including the fastening of the seat belt, when necessitated by the rider's condition.

13.To confirm, prior to allowing any vehicle to proceed, that all passengers are properly secured in their seat belts, car seats, and, when applicable, that wheelchairs and passengers who use wheelchairs are properly secured (Exception: Only a passenger who has a letter, carried on his/her person and signed by the passenger's physician, stating that the passenger's medical condition prevents the rider from using a seat belt, may be transported without a fastened seat belt and then only as allowed by state law).

14.To provide an appropriate level of assistance to passengers, when requested, or when necessitated by a passenger's condition.

15.To provide support and direction to passengers. Such assistance shall also apply to the movement of wheelchairs and mobility-limited persons as they enter or exit the vehicle using the wheelchair lift/ramp, as applicable. Such assistance shall also include stowage by the driver of mobility aids and folding wheelchairs.

16.To act in a professional manner at all times while providing services.

17.To be clean and maintain a neat appearance at all times.

18.To be polite and courteous to riders; riders shall be treated with respect and in a culturally appropriate manner when receiving transportation services. The Manager should notify the volunteer driver of any known cultural issues significant to providing transportation services.

19.To limit review of any confidential rider information to the minimum information necessary to provide the service.

20.To only use or record confidential rider information as necessary to provide the Department information necessary for the administration of the program (i.e. mileage reimbursement, if applicable).


21. To not to retain any original or copy of any document rider shares with you for purposes of transport.

22. To not to retain any original or copy of any document that may be provided by a health care provider to driver. Driver agrees to ensure that such documentation leaves with rider.

23. To report any breach of the terms of this user agreement to the Department. This includes, but is not limited to, accidental retention of medical record or other confidential rider information.

24. To return to the Department, as soon as possible, but in no event later than 3 business days after discovery, any confidential rider information retained left with driver after completing transport of the rider.

25. To never discuss, write, or share in any other format any information specific to a rider, except as necessary to communicate with the Department or with a health care provider or other staff at a facility rider is being transported to.

26. Not input or include any confidential rider information in any computer system of any kind, except as approved by the Department. This includes personal email accounts, file transfer systems, note applications, and any other electronic system of recording data not expressly approved for use by the Department.

27. Comply with any other agreements driver has entered into with respect to this program.

28. Respect the rider's privacy by not asking for more information about the individual's condition, reason for visit, or other personal information, while providing transport services. If the rider chooses to voluntarily share this information, it is subject to the same protections described above regarding protecting rider information.

☑By checking this, I certify that I have read and that I agree and accept the enrollment conditions in the Medical Assistance Provider Enrollment & Trading Partner Agreement.


| Provider ID | SSO ID | SSO First Name | SSO Last Name | NPI | Provider Name | Submission Date |
|---|---|---|---|---|---|---|
| ▮▮▮ | ▮▮▮ | Kerisha | Williams | | FIRST ALLIANCE HOME CARE | 12/06/2018 |
| **Terms and Conditions** | | | | | | |

Terms and Conditions Atypical Enrollment

Participation as Home Help Provider

1.As an individual provider of Home Help services, I agree that the Medicaid beneficiary is considered the employer. I am not employed by the Michigan Department Of Health and Human Services (MDHHS), the Department of Human Services (DHS), or the State of Michigan.

2.As a Home Help provider agency, I agree that the agency contract is with the Medicaid beneficiary. The agency contract is not with the Michigan Department Of Health and Human Services (MDHHS), the Department of Human Services or the State of Michigan.

3.I agree that personal care services will be provided for a Michigan Medicaid beneficiary, as authorized by the Michigan Department of Human Services (DHS) according to the DHS Adult Services Comprehensive Assessment.

4.Under Section 3504 of the Internal Revenue Code, I agree to accept the Michigan Department Of Health and Human Services (MDHHS) as the acting agent of the beneficiary for the deduction of withholding of FICA taxes. I understand that federal, state and city taxes are not withheld. I further agree to accept payments issued by MDHHS as payment in full and not to seek or accept additional payments from the beneficiary or any other source.

5.I agree to return any payments received for Home Help services not provided. I understand that accepting payment for services I did not provide is fraudulent and could result in criminal charges.

6.I understand that the Home Help program is funded by Medicaid and payments will not be approved by the Department if the beneficiary's Medicaid eligibility is inactive.

7.In order to receive payment, I agree to keep and submit to MDHHS, DHS or their designee, any and all records necessary to disclose the extent of services provided to the beneficiary.

8.Upon request, I agree to provide MDHHS, DHS or their designee, any information regarding services or purchases for which payment was made.

9.Upon request, I agree to provide MDHHS, DHS or their designee, any business transaction information as specified by 42 CFR 455.105.

10.I understand I will be subject to a criminal history screening and may not qualify to be a home help provider.

11.I agree to cooperate with MDHHS, DHS or their designee, regarding any audits, investigations or inquiries related to Home Help services provided.

**Report Date:** 05/10/2023
10:05:22 AM

 Michigan Department of Health and
Human Services

Print Terms and Conditions Report

Modification Submission



12.I agree to report any changes relative to the beneficiary including but not limited to hospitalizations, nursing home stays or discontinuation of services.

13.I agree to comply with the privacy, security and confidentiality provisions of all applicable laws governing the use and disclosure of protected health information (PHI), including the privacy regulations adopted by the U.S. Department of Health and Human Services under the Health Insurance Portability and Accountability Act of 1996 (HIPAA), and Public Acts 104-191 (45 CFR parts 106 and 164, Subparts A, C, and E).

14.I agree to comply with the provisions of 42 CFR 431.107 and Act No. 280 of the Public Acts of 1939, as amended, which state the conditions and requirements under which participation in the Medical Assistance Program is allowed.

Participation as Non-Emergency Transportation Provider

Definitions:

Confidential Rider Information: Includes, but is not limited to, the rider's medical record, any information provided by a health care provider, any other personally identifying information, and any information about the time of travel, destination, or pick up location.
Department means the Michigan Department of Health and Human Services.
Driver means an individual providing Non-Emergency Medical Transportation.
Rider means the individual being transported by driver.
Service means the provision by driver of Non-Emergency Medical Transportation for rider.

Terms:

Driver agrees to abide by the following terms and conditions:

1.To act in a professional manner at all times while providing services.

2.To never make comments that are sexually explicit in nature, solicit sexual favors, or engage in sexual activity with ride.

3.To never solicit or accept controlled substances, alcohol, or medication from rider.

4.To never solicit or accept money from riders.

5.To never use alcohol, narcotics, or controlled substances, or be under their influence, while providing services to riders. Prescribed medications can be used by a driver as long as his or her duties can still be performed in a safe manner and driver has written documentation from a treating physician that the medication does not impact the ability to drive.

6.To never eat or consume any beverage while operating the vehicle or while involved in rider assistance.

7.To never smoke in the vehicle when rider is present. For purposes of this agreement, "smoke" includes electronic

**Report Date:** 05/10/2023
10:05:22 AM

 Michigan Department of Health and
Human Services

Print Terms and Conditions Report

Modification Submission



cigarettes and any other product or device which emits vapor, smoke, or any similar gaseous matter of any kind.

8.To never wear any type of headphone while providing the service.

9.To be responsible for rider's personal items.

10.To provide, as appropriate to the needs of the rider, assistance with exiting the vehicle, to open and close vehicle doors when passengers enter or exit the vehicle, and to provide assistance as necessary to or from the main door of the place of destination.

11.To properly identify and announce their presence at the entrance of the building at the specified pick-up location if a curbside pick-up is not apparent, or with attending facility staff.

12.To assist the passengers in the process of being seated, including the fastening of the seat belt, when necessitated by the rider's condition.

13.To confirm, prior to allowing any vehicle to proceed, that all passengers are properly secured in their seat belts, car seats, and, when applicable, that wheelchairs and passengers who use wheelchairs are properly secured (Exception: Only a passenger who has a letter, carried on his/her person and signed by the passenger's physician, stating that the passenger's medical condition prevents the rider from using a seat belt, may be transported without a fastened seat belt and then only as allowed by state law).

14.To provide an appropriate level of assistance to passengers, when requested, or when necessitated by a passenger's condition.

15.To provide support and direction to passengers. Such assistance shall also apply to the movement of wheelchairs and mobility-limited persons as they enter or exit the vehicle using the wheelchair lift/ramp, as applicable. Such assistance shall also include stowage by the driver of mobility aids and folding wheelchairs.

16.To act in a professional manner at all times while providing services.

17.To be clean and maintain a neat appearance at all times.

18.To be polite and courteous to riders; riders shall be treated with respect and in a culturally appropriate manner when receiving transportation services. The Manager should notify the volunteer driver of any known cultural issues significant to providing transportation services.

19.To limit review of any confidential rider information to the minimum information necessary to provide the service.

20.To only use or record confidential rider information as necessary to provide the Department information necessary for the administration of the program (i.e. mileage reimbursement, if applicable).

**Report Date:** 05/10/2023
10:05:22 AM

 Michigan Department of Health and
Human Services

Print Terms and Conditions Report

Modification Submission



21. To not to retain any original or copy of any document rider shares with you for purposes of transport.

22. To not to retain any original or copy of any document that may be provided by a health care provider to driver. Driver agrees to ensure that such documentation leaves with rider.

23. To report any breach of the terms of this user agreement to the Department. This includes, but is not limited to, accidental retention of medical record or other confidential rider information.

24. To return to the Department, as soon as possible, but in no event later than 3 business days after discovery, any confidential rider information retained left with driver after completing transport of the rider.

25. To never discuss, write, or share in any other format any information specific to a rider, except as necessary to communicate with the Department or with a health care provider or other staff at a facility rider is being transported to.

26. Not input or include any confidential rider information in any computer system of any kind, except as approved by the Department. This includes personal email accounts, file transfer systems, note applications, and any other electronic system of recording data not expressly approved for use by the Department.

27. Comply with any other agreements driver has entered into with respect to this program.

28. Respect the rider's privacy by not asking for more information about the individual's condition, reason for visit, or other personal information, while providing transport services. If the rider chooses to voluntarily share this information, it is subject to the same protections described above regarding protecting rider information.

☑By checking this, I certify that I have read and that I agree and accept the enrollment conditions in the Medical Assistance Provider Enrollment & Trading Partner Agreement.


| Provider ID | SSO ID | SSO First Name | SSO Last Name | NPI | Provider Name | Submission Date |
|---|---|---|---|---|---|---|
| ███ | ███ | Kerisha | Williams | | FIRST ALLIANCE HOME CARE | 02/04/2019 |
| **Terms and Conditions** | | | | | | |

Terms and Conditions Atypical Enrollment

Participation as Home Help Provider

1.As an individual provider of Home Help services, I agree that the Medicaid beneficiary is considered the employer. I am not employed by the Michigan Department Of Health and Human Services (MDHHS), the Department of Human Services (DHS), or the State of Michigan.

2.As a Home Help provider agency, I agree that the agency contract is with the Medicaid beneficiary. The agency contract is not with the Michigan Department Of Health and Human Services (MDHHS), the Department of Human Services or the State of Michigan.

3.I agree that personal care services will be provided for a Michigan Medicaid beneficiary, as authorized by the Michigan Department of Human Services (DHS) according to the DHS Adult Services Comprehensive Assessment.

4.Under Section 3504 of the Internal Revenue Code, I agree to accept the Michigan Department Of Health and Human Services (MDHHS) as the acting agent of the beneficiary for the deduction of withholding of FICA taxes. I understand that federal, state and city taxes are not withheld. I further agree to accept payments issued by MDHHS as payment in full and not to seek or accept additional payments from the beneficiary or any other source.

5.I agree to return any payments received for Home Help services not provided. I understand that accepting payment for services I did not provide is fraudulent and could result in criminal charges.

6.I understand that the Home Help program is funded by Medicaid and payments will not be approved by the Department if the beneficiary's Medicaid eligibility is inactive.

7.In order to receive payment, I agree to keep and submit to MDHHS, DHS or their designee, any and all records necessary to disclose the extent of services provided to the beneficiary.

8.Upon request, I agree to provide MDHHS, DHS or their designee, any information regarding services or purchases for which payment was made.

9.Upon request, I agree to provide MDHHS, DHS or their designee, any business transaction information as specified by 42 CFR 455.105.

10.I understand I will be subject to a criminal history screening and may not qualify to be a home help provider.

11.I agree to cooperate with MDHHS, DHS or their designee, regarding any audits, investigations or inquiries related to Home Help services provided.

**Report Date:** 05/10/2023
10:05:22 AM

 Michigan Department of Health and
Human Services

Print Terms and Conditions Report

Modification Submission



12.I agree to report any changes relative to the beneficiary including but not limited to hospitalizations, nursing home stays or discontinuation of services.

13.I agree to comply with the privacy, security and confidentiality provisions of all applicable laws governing the use and disclosure of protected health information (PHI), including the privacy regulations adopted by the U.S. Department of Health and Human Services under the Health Insurance Portability and Accountability Act of 1996 (HIPAA), and Public Acts 104-191 (45 CFR parts 106 and 164, Subparts A, C, and E).

14.I agree to comply with the provisions of 42 CFR 431.107 and Act No. 280 of the Public Acts of 1939, as amended, which state the conditions and requirements under which participation in the Medical Assistance Program is allowed.

Participation as Non-Emergency Transportation Provider

Definitions:

Confidential Rider Information: Includes, but is not limited to, the rider's medical record, any information provided by a health care provider, any other personally identifying information, and any information about the time of travel, destination, or pick up location.
Department means the Michigan Department of Health and Human Services.
Driver means an individual providing Non-Emergency Medical Transportation.
Rider means the individual being transported by driver.
Service means the provision by driver of Non-Emergency Medical Transportation for rider.

Terms:

Driver agrees to abide by the following terms and conditions:

1.To act in a professional manner at all times while providing services.

2.To never make comments that are sexually explicit in nature, solicit sexual favors, or engage in sexual activity with ride.

3.To never solicit or accept controlled substances, alcohol, or medication from rider.

4.To never solicit or accept money from riders.

5.To never use alcohol, narcotics, or controlled substances, or be under their influence, while providing services to riders. Prescribed medications can be used by a driver as long as his or her duties can still be performed in a safe manner and driver has written documentation from a treating physician that the medication does not impact the ability to drive.

6.To never eat or consume any beverage while operating the vehicle or while involved in rider assistance.

7.To never smoke in the vehicle when rider is present. For purposes of this agreement, "smoke" includes electronic


cigarettes and any other product or device which emits vapor, smoke, or any similar gaseous matter of any kind.

8.To never wear any type of headphone while providing the service.

9.To be responsible for rider's personal items.

10.To provide, as appropriate to the needs of the rider, assistance with exiting the vehicle, to open and close vehicle doors when passengers enter or exit the vehicle, and to provide assistance as necessary to or from the main door of the place of destination.

11.To properly identify and announce their presence at the entrance of the building at the specified pick-up location if a curbside pick-up is not apparent, or with attending facility staff.

12.To assist the passengers in the process of being seated, including the fastening of the seat belt, when necessitated by the rider's condition.

13.To confirm, prior to allowing any vehicle to proceed, that all passengers are properly secured in their seat belts, car seats, and, when applicable, that wheelchairs and passengers who use wheelchairs are properly secured (Exception: Only a passenger who has a letter, carried on his/her person and signed by the passenger's physician, stating that the passenger's medical condition prevents the rider from using a seat belt, may be transported without a fastened seat belt and then only as allowed by state law).

14.To provide an appropriate level of assistance to passengers, when requested, or when necessitated by a passenger's condition.

15.To provide support and direction to passengers. Such assistance shall also apply to the movement of wheelchairs and mobility-limited persons as they enter or exit the vehicle using the wheelchair lift/ramp, as applicable. Such assistance shall also include stowage by the driver of mobility aids and folding wheelchairs.

16.To act in a professional manner at all times while providing services.

17.To be clean and maintain a neat appearance at all times.

18.To be polite and courteous to riders; riders shall be treated with respect and in a culturally appropriate manner when receiving transportation services. The Manager should notify the volunteer driver of any known cultural issues significant to providing transportation services.

19.To limit review of any confidential rider information to the minimum information necessary to provide the service.

20.To only use or record confidential rider information as necessary to provide the Department information necessary for the administration of the program (i.e. mileage reimbursement, if applicable).

**Report Date:** 05/10/2023
10:05:22 AM

 Michigan Department of Health and
Human Services

Print Terms and Conditions Report

Modification Submission



21.To not to retain any original or copy of any document rider shares with you for purposes of transport.

22.To not to retain any original or copy of any document that may be provided by a health care provider to driver. Driver agrees to ensure that such documentation leaves with rider.

23.To report any breach of the terms of this user agreement to the Department. This includes, but is not limited to, accidental retention of medical record or other confidential rider information.

24.To return to the Department, as soon as possible, but in no event later than 3 business days after discovery, any confidential rider information retained left with driver after completing transport of the rider.

25.To never discuss, write, or share in any other format any information specific to a rider, except as necessary to communicate with the Department or with a health care provider or other staff at a facility rider is being transported to.

26.Not input or include any confidential rider information in any computer system of any kind, except as approved by the Department. This includes personal email accounts, file transfer systems, note applications, and any other electronic system of recording data not expressly approved for use by the Department.

27.Comply with any other agreements driver has entered into with respect to this program.

28.Respect the rider's privacy by not asking for more information about the individual's condition, reason for visit, or other personal information, while providing transport services. If the rider chooses to voluntarily share this information, it is subject to the same protections described above regarding protecting rider information.

☑By checking this, I certify that I have read and that I agree and accept the enrollment conditions in the Medical Assistance Provider Enrollment & Trading Partner Agreement.



| Provider ID | SSO ID | SSO First Name | SSO Last Name | NPI | Provider Name | Submission Date |
|---|---|---|---|---|---|---|
| ███ | ███ | Kerisha | Williams | | FIRST ALLIANCE HOME CARE | 02/18/2019 |
| **Terms and Conditions** | | | | | | |

Terms and Conditions Atypical Enrollment

Participation as Home Help Provider

1. As an individual provider of Home Help services, I agree that the Medicaid beneficiary is considered the employer. I am not employed by the Michigan Department Of Health and Human Services (MDHHS), the Department of Human Services (DHS), or the State of Michigan.

2. As a Home Help provider agency, I agree that the agency contract is with the Medicaid beneficiary. The agency contract is not with the Michigan Department Of Health and Human Services (MDHHS), the Department of Human Services or the State of Michigan.

3. I agree that personal care services will be provided for a Michigan Medicaid beneficiary, as authorized by the Michigan Department of Human Services (DHS) according to the DHS Adult Services Comprehensive Assessment.

4. Under Section 3504 of the Internal Revenue Code, I agree to accept the Michigan Department Of Health and Human Services (MDHHS) as the acting agent of the beneficiary for the deduction of withholding of FICA taxes. I understand that federal, state and city taxes are not withheld. I further agree to accept payments issued by MDHHS as payment in full and not to seek or accept additional payments from the beneficiary or any other source.

5. I agree to return any payments received for Home Help services not provided. I understand that accepting payment for services I did not provide is fraudulent and could result in criminal charges.

6. I understand that the Home Help program is funded by Medicaid and payments will not be approved by the Department if the beneficiary's Medicaid eligibility is inactive.

7. In order to receive payment, I agree to keep and submit to MDHHS, DHS or their designee, any and all records necessary to disclose the extent of services provided to the beneficiary.

8. Upon request, I agree to provide MDHHS, DHS or their designee, any information regarding services or purchases for which payment was made.

9. Upon request, I agree to provide MDHHS, DHS or their designee, any business transaction information as specified by 42 CFR 455.105.

10. I understand I will be subject to a criminal history screening and may not qualify to be a home help provider.

11. I agree to cooperate with MDHHS, DHS or their designee, regarding any audits, investigations or inquiries related to Home Help services provided.

**Report Date:** 05/10/2023
10:05:22 AM

 Michigan Department of Health and
Human Services

Print Terms and Conditions Report

Modification Submission



12.I agree to report any changes relative to the beneficiary including but not limited to hospitalizations, nursing home stays or discontinuation of services.

13.I agree to comply with the privacy, security and confidentiality provisions of all applicable laws governing the use and disclosure of protected health information (PHI), including the privacy regulations adopted by the U.S. Department of Health and Human Services under the Health Insurance Portability and Accountability Act of 1996 (HIPAA), and Public Acts 104-191 (45 CFR parts 106 and 164, Subparts A, C, and E).

14.I agree to comply with the provisions of 42 CFR 431.107 and Act No. 280 of the Public Acts of 1939, as amended, which state the conditions and requirements under which participation in the Medical Assistance Program is allowed.

Participation as Non-Emergency Transportation Provider

Definitions:

Confidential Rider Information: Includes, but is not limited to, the rider's medical record, any information provided by a health care provider, any other personally identifying information, and any information about the time of travel, destination, or pick up location.
Department means the Michigan Department of Health and Human Services.
Driver means an individual providing Non-Emergency Medical Transportation.
Rider means the individual being transported by driver.
Service means the provision by driver of Non-Emergency Medical Transportation for rider.

Terms:

Driver agrees to abide by the following terms and conditions:

1.To act in a professional manner at all times while providing services.

2.To never make comments that are sexually explicit in nature, solicit sexual favors, or engage in sexual activity with ride.

3.To never solicit or accept controlled substances, alcohol, or medication from rider.

4.To never solicit or accept money from riders.

5.To never use alcohol, narcotics, or controlled substances, or be under their influence, while providing services to riders. Prescribed medications can be used by a driver as long as his or her duties can still be performed in a safe manner and driver has written documentation from a treating physician that the medication does not impact the ability to drive.

6.To never eat or consume any beverage while operating the vehicle or while involved in rider assistance.

7.To never smoke in the vehicle when rider is present. For purposes of this agreement, "smoke" includes electronic


cigarettes and any other product or device which emits vapor, smoke, or any similar gaseous matter of any kind.

8.To never wear any type of headphone while providing the service.

9.To be responsible for rider's personal items.

10.To provide, as appropriate to the needs of the rider, assistance with exiting the vehicle, to open and close vehicle doors when passengers enter or exit the vehicle, and to provide assistance as necessary to or from the main door of the place of destination.

11.To properly identify and announce their presence at the entrance of the building at the specified pick-up location if a curbside pick-up is not apparent, or with attending facility staff.

12.To assist the passengers in the process of being seated, including the fastening of the seat belt, when necessitated by the rider's condition.

13.To confirm, prior to allowing any vehicle to proceed, that all passengers are properly secured in their seat belts, car seats, and, when applicable, that wheelchairs and passengers who use wheelchairs are properly secured (Exception: Only a passenger who has a letter, carried on his/her person and signed by the passenger's physician, stating that the passenger's medical condition prevents the rider from using a seat belt, may be transported without a fastened seat belt and then only as allowed by state law).

14.To provide an appropriate level of assistance to passengers, when requested, or when necessitated by a passenger's condition.

15.To provide support and direction to passengers. Such assistance shall also apply to the movement of wheelchairs and mobility-limited persons as they enter or exit the vehicle using the wheelchair lift/ramp, as applicable. Such assistance shall also include stowage by the driver of mobility aids and folding wheelchairs.

16.To act in a professional manner at all times while providing services.

17.To be clean and maintain a neat appearance at all times.

18.To be polite and courteous to riders; riders shall be treated with respect and in a culturally appropriate manner when receiving transportation services. The Manager should notify the volunteer driver of any known cultural issues significant to providing transportation services.

19.To limit review of any confidential rider information to the minimum information necessary to provide the service.

20.To only use or record confidential rider information as necessary to provide the Department information necessary for the administration of the program (i.e. mileage reimbursement, if applicable).

**Report Date:** 05/10/2023
10:05:22 AM

 Michigan Department of Health and
Human Services

Print Terms and Conditions Report

Modification Submission



21. To not to retain any original or copy of any document rider shares with you for purposes of transport.

22. To not to retain any original or copy of any document that may be provided by a health care provider to driver. Driver agrees to ensure that such documentation leaves with rider.

23. To report any breach of the terms of this user agreement to the Department. This includes, but is not limited to, accidental retention of medical record or other confidential rider information.

24. To return to the Department, as soon as possible, but in no event later than 3 business days after discovery, any confidential rider information retained left with driver after completing transport of the rider.

25. To never discuss, write, or share in any other format any information specific to a rider, except as necessary to communicate with the Department or with a health care provider or other staff at a facility rider is being transported to.

26. Not input or include any confidential rider information in any computer system of any kind, except as approved by the Department. This includes personal email accounts, file transfer systems, note applications, and any other electronic system of recording data not expressly approved for use by the Department.

27. Comply with any other agreements driver has entered into with respect to this program.

28. Respect the rider's privacy by not asking for more information about the individual's condition, reason for visit, or other personal information, while providing transport services. If the rider chooses to voluntarily share this information, it is subject to the same protections described above regarding protecting rider information.

☑ By checking this, I certify that I have read and that I agree and accept the enrollment conditions in the Medical Assistance Provider Enrollment & Trading Partner Agreement.


| Provider ID | SSO ID | SSO First Name | SSO Last Name | NPI | Provider Name | Submission Date |
|---|---|---|---|---|---|---|
| ▉ | ▉ | Kerisha | Williams | | FIRST ALLIANCE HOME CARE | 02/25/2019 |
| **Terms and Conditions** | | | | | | |

Terms and Conditions Atypical Enrollment

Participation as Home Help Provider

1.As an individual provider of Home Help services, I agree that the Medicaid beneficiary is considered the employer. I am not employed by the Michigan Department Of Health and Human Services (MDHHS), the Department of Human Services (DHS), or the State of Michigan.

2.As a Home Help provider agency, I agree that the agency contract is with the Medicaid beneficiary. The agency contract is not with the Michigan Department Of Health and Human Services (MDHHS), the Department of Human Services or the State of Michigan.

3.I agree that personal care services will be provided for a Michigan Medicaid beneficiary, as authorized by the Michigan Department of Human Services (DHS) according to the DHS Adult Services Comprehensive Assessment.

4.Under Section 3504 of the Internal Revenue Code, I agree to accept the Michigan Department Of Health and Human Services (MDHHS) as the acting agent of the beneficiary for the deduction of withholding of FICA taxes. I understand that federal, state and city taxes are not withheld. I further agree to accept payments issued by MDHHS as payment in full and not to seek or accept additional payments from the beneficiary or any other source.

5.I agree to return any payments received for Home Help services not provided. I understand that accepting payment for services I did not provide is fraudulent and could result in criminal charges.

6.I understand that the Home Help program is funded by Medicaid and payments will not be approved by the Department if the beneficiary's Medicaid eligibility is inactive.

7.In order to receive payment, I agree to keep and submit to MDHHS, DHS or their designee, any and all records necessary to disclose the extent of services provided to the beneficiary.

8.Upon request, I agree to provide MDHHS, DHS or their designee, any information regarding services or purchases for which payment was made.

9.Upon request, I agree to provide MDHHS, DHS or their designee, any business transaction information as specified by 42 CFR 455.105.

10.I understand I will be subject to a criminal history screening and may not qualify to be a home help provider.

11.I agree to cooperate with MDHHS, DHS or their designee, regarding any audits, investigations or inquiries related to Home Help services provided.


12.I agree to report any changes relative to the beneficiary including but not limited to hospitalizations, nursing home stays or discontinuation of services.

13.I agree to comply with the privacy, security and confidentiality provisions of all applicable laws governing the use and disclosure of protected health information (PHI), including the privacy regulations adopted by the U.S. Department of Health and Human Services under the Health Insurance Portability and Accountability Act of 1996 (HIPAA), and Public Acts 104-191 (45 CFR parts 106 and 164, Subparts A, C, and E).

14.I agree to comply with the provisions of 42 CFR 431.107 and Act No. 280 of the Public Acts of 1939, as amended, which state the conditions and requirements under which participation in the Medical Assistance Program is allowed.

Participation as Non-Emergency Transportation Provider

Definitions:

Confidential Rider Information: Includes, but is not limited to, the rider's medical record, any information provided by a health care provider, any other personally identifying information, and any information about the time of travel, destination, or pick up location.
Department means the Michigan Department of Health and Human Services.
Driver means an individual providing Non-Emergency Medical Transportation.
Rider means the individual being transported by driver.
Service means the provision by driver of Non-Emergency Medical Transportation for rider.

Terms:

Driver agrees to abide by the following terms and conditions:

1.To act in a professional manner at all times while providing services.

2.To never make comments that are sexually explicit in nature, solicit sexual favors, or engage in sexual activity with ride.

3.To never solicit or accept controlled substances, alcohol, or medication from rider.

4.To never solicit or accept money from riders.

5.To never use alcohol, narcotics, or controlled substances, or be under their influence, while providing services to riders. Prescribed medications can be used by a driver as long as his or her duties can still be performed in a safe manner and driver has written documentation from a treating physician that the medication does not impact the ability to drive.

6.To never eat or consume any beverage while operating the vehicle or while involved in rider assistance.

7.To never smoke in the vehicle when rider is present. For purposes of this agreement, "smoke" includes electronic


cigarettes and any other product or device which emits vapor, smoke, or any similar gaseous matter of any kind.

8.To never wear any type of headphone while providing the service.

9.To be responsible for rider's personal items.

10.To provide, as appropriate to the needs of the rider, assistance with exiting the vehicle, to open and close vehicle doors when passengers enter or exit the vehicle, and to provide assistance as necessary to or from the main door of the place of destination.

11.To properly identify and announce their presence at the entrance of the building at the specified pick-up location if a curbside pick-up is not apparent, or with attending facility staff.

12.To assist the passengers in the process of being seated, including the fastening of the seat belt, when necessitated by the rider's condition.

13.To confirm, prior to allowing any vehicle to proceed, that all passengers are properly secured in their seat belts, car seats, and, when applicable, that wheelchairs and passengers who use wheelchairs are properly secured (Exception: Only a passenger who has a letter, carried on his/her person and signed by the passenger's physician, stating that the passenger's medical condition prevents the rider from using a seat belt, may be transported without a fastened seat belt and then only as allowed by state law).

14.To provide an appropriate level of assistance to passengers, when requested, or when necessitated by a passenger's condition.

15.To provide support and direction to passengers. Such assistance shall also apply to the movement of wheelchairs and mobility-limited persons as they enter or exit the vehicle using the wheelchair lift/ramp, as applicable. Such assistance shall also include stowage by the driver of mobility aids and folding wheelchairs.

16.To act in a professional manner at all times while providing services.

17.To be clean and maintain a neat appearance at all times.

18.To be polite and courteous to riders; riders shall be treated with respect and in a culturally appropriate manner when receiving transportation services. The Manager should notify the volunteer driver of any known cultural issues significant to providing transportation services.

19.To limit review of any confidential rider information to the minimum information necessary to provide the service.

20.To only use or record confidential rider information as necessary to provide the Department information necessary for the administration of the program (i.e. mileage reimbursement, if applicable).

**Report Date:** 05/10/2023
10:05:22 AM

 Michigan Department of Health and
Human Services

Print Terms and Conditions Report

Modification Submission



21. To not to retain any original or copy of any document rider shares with you for purposes of transport.

22. To not to retain any original or copy of any document that may be provided by a health care provider to driver. Driver agrees to ensure that such documentation leaves with rider.

23. To report any breach of the terms of this user agreement to the Department. This includes, but is not limited to, accidental retention of medical record or other confidential rider information.

24. To return to the Department, as soon as possible, but in no event later than 3 business days after discovery, any confidential rider information retained left with driver after completing transport of the rider.

25. To never discuss, write, or share in any other format any information specific to a rider, except as necessary to communicate with the Department or with a health care provider or other staff at a facility rider is being transported to.

26. Not input or include any confidential rider information in any computer system of any kind, except as approved by the Department. This includes personal email accounts, file transfer systems, note applications, and any other electronic system of recording data not expressly approved for use by the Department.

27. Comply with any other agreements driver has entered into with respect to this program.

28. Respect the rider's privacy by not asking for more information about the individual's condition, reason for visit, or other personal information, while providing transport services. If the rider chooses to voluntarily share this information, it is subject to the same protections described above regarding protecting rider information.

☑ By checking this, I certify that I have read and that I agree and accept the enrollment conditions in the Medical Assistance Provider Enrollment & Trading Partner Agreement.


| Provider ID | SSO ID | SSO First Name | SSO Last Name | NPI | Provider Name | Submission Date |
|---|---|---|---|---|---|---|
| ▮▮▮▮▮ | ▮▮▮▮▮ | Kerisha | Williams | | FIRST ALLIANCE HOME CARE | 02/27/2019 |
| **Terms and Conditions** | | | | | | |

Terms and Conditions Atypical Enrollment

Participation as Home Help Provider

1.As an individual provider of Home Help services, I agree that the Medicaid beneficiary is considered the employer. I am not employed by the Michigan Department Of Health and Human Services (MDHHS), the Department of Human Services (DHS), or the State of Michigan.

2.As a Home Help provider agency, I agree that the agency contract is with the Medicaid beneficiary. The agency contract is not with the Michigan Department Of Health and Human Services (MDHHS), the Department of Human Services or the State of Michigan.

3.I agree that personal care services will be provided for a Michigan Medicaid beneficiary, as authorized by the Michigan Department of Human Services (DHS) according to the DHS Adult Services Comprehensive Assessment.

4.Under Section 3504 of the Internal Revenue Code, I agree to accept the Michigan Department Of Health and Human Services (MDHHS) as the acting agent of the beneficiary for the deduction of withholding of FICA taxes. I understand that federal, state and city taxes are not withheld. I further agree to accept payments issued by MDHHS as payment in full and not to seek or accept additional payments from the beneficiary or any other source.

5.I agree to return any payments received for Home Help services not provided. I understand that accepting payment for services I did not provide is fraudulent and could result in criminal charges.

6.I understand that the Home Help program is funded by Medicaid and payments will not be approved by the Department if the beneficiary's Medicaid eligibility is inactive.

7.In order to receive payment, I agree to keep and submit to MDHHS, DHS or their designee, any and all records necessary to disclose the extent of services provided to the beneficiary.

8.Upon request, I agree to provide MDHHS, DHS or their designee, any information regarding services or purchases for which payment was made.

9.Upon request, I agree to provide MDHHS, DHS or their designee, any business transaction information as specified by 42 CFR 455.105.

10.I understand I will be subject to a criminal history screening and may not qualify to be a home help provider.

11.I agree to cooperate with MDHHS, DHS or their designee, regarding any audits, investigations or inquiries related to Home Help services provided.



12.I agree to report any changes relative to the beneficiary including but not limited to hospitalizations, nursing home stays or discontinuation of services.

13.I agree to comply with the privacy, security and confidentiality provisions of all applicable laws governing the use and disclosure of protected health information (PHI), including the privacy regulations adopted by the U.S. Department of Health and Human Services under the Health Insurance Portability and Accountability Act of 1996 (HIPAA), and Public Acts 104-191 (45 CFR parts 106 and 164, Subparts A, C, and E).

14.I agree to comply with the provisions of 42 CFR 431.107 and Act No. 280 of the Public Acts of 1939, as amended, which state the conditions and requirements under which participation in the Medical Assistance Program is allowed.

Participation as Non-Emergency Transportation Provider

Definitions:

Confidential Rider Information: Includes, but is not limited to, the rider's medical record, any information provided by a health care provider, any other personally identifying information, and any information about the time of travel, destination, or pick up location.
Department means the Michigan Department of Health and Human Services.
Driver means an individual providing Non-Emergency Medical Transportation.
Rider means the individual being transported by driver.
Service means the provision by driver of Non-Emergency Medical Transportation for rider.

Terms:

Driver agrees to abide by the following terms and conditions:

1.To act in a professional manner at all times while providing services.

2.To never make comments that are sexually explicit in nature, solicit sexual favors, or engage in sexual activity with ride.

3.To never solicit or accept controlled substances, alcohol, or medication from rider.

4.To never solicit or accept money from riders.

5.To never use alcohol, narcotics, or controlled substances, or be under their influence, while providing services to riders. Prescribed medications can be used by a driver as long as his or her duties can still be performed in a safe manner and driver has written documentation from a treating physician that the medication does not impact the ability to drive.

6.To never eat or consume any beverage while operating the vehicle or while involved in rider assistance.

7.To never smoke in the vehicle when rider is present. For purposes of this agreement, "smoke" includes electronic

**Report Date:** 05/10/2023
10:05:22 AM

 Michigan Department of Health and
Human Services

Print Terms and Conditions Report

Modification Submission



cigarettes and any other product or device which emits vapor, smoke, or any similar gaseous matter of any kind.

8.To never wear any type of headphone while providing the service.

9.To be responsible for rider's personal items.

10.To provide, as appropriate to the needs of the rider, assistance with exiting the vehicle, to open and close vehicle doors when passengers enter or exit the vehicle, and to provide assistance as necessary to or from the main door of the place of destination.

11.To properly identify and announce their presence at the entrance of the building at the specified pick-up location if a curbside pick-up is not apparent, or with attending facility staff.

12.To assist the passengers in the process of being seated, including the fastening of the seat belt, when necessitated by the rider's condition.

13.To confirm, prior to allowing any vehicle to proceed, that all passengers are properly secured in their seat belts, car seats, and, when applicable, that wheelchairs and passengers who use wheelchairs are properly secured (Exception: Only a passenger who has a letter, carried on his/her person and signed by the passenger's physician, stating that the passenger's medical condition prevents the rider from using a seat belt, may be transported without a fastened seat belt and then only as allowed by state law).

14.To provide an appropriate level of assistance to passengers, when requested, or when necessitated by a passenger's condition.

15.To provide support and direction to passengers. Such assistance shall also apply to the movement of wheelchairs and mobility-limited persons as they enter or exit the vehicle using the wheelchair lift/ramp, as applicable. Such assistance shall also include stowage by the driver of mobility aids and folding wheelchairs.

16.To act in a professional manner at all times while providing services.

17.To be clean and maintain a neat appearance at all times.

18.To be polite and courteous to riders; riders shall be treated with respect and in a culturally appropriate manner when receiving transportation services. The Manager should notify the volunteer driver of any known cultural issues significant to providing transportation services.

19.To limit review of any confidential rider information to the minimum information necessary to provide the service.

20.To only use or record confidential rider information as necessary to provide the Department information necessary for the administration of the program (i.e. mileage reimbursement, if applicable).

**Report Date:** 05/10/2023
10:05:22 AM

 Michigan Department of Health and
Human Services

Print Terms and Conditions Report

Modification Submission



21.To not to retain any original or copy of any document rider shares with you for purposes of transport.

22.To not to retain any original or copy of any document that may be provided by a health care provider to driver. Driver agrees to ensure that such documentation leaves with rider.

23.To report any breach of the terms of this user agreement to the Department. This includes, but is not limited to, accidental retention of medical record or other confidential rider information.

24.To return to the Department, as soon as possible, but in no event later than 3 business days after discovery, any confidential rider information retained left with driver after completing transport of the rider.

25.To never discuss, write, or share in any other format any information specific to a rider, except as necessary to communicate with the Department or with a health care provider or other staff at a facility rider is being transported to.

26.Not input or include any confidential rider information in any computer system of any kind, except as approved by the Department. This includes personal email accounts, file transfer systems, note applications, and any other electronic system of recording data not expressly approved for use by the Department.

27.Comply with any other agreements driver has entered into with respect to this program.

28.Respect the rider's privacy by not asking for more information about the individual's condition, reason for visit, or other personal information, while providing transport services. If the rider chooses to voluntarily share this information, it is subject to the same protections described above regarding protecting rider information.

☑By checking this, I certify that I have read and that I agree and accept the enrollment conditions in the Medical Assistance Provider Enrollment & Trading Partner Agreement.



| Provider ID | SSO ID | SSO First Name | SSO Last Name | NPI | Provider Name | Submission Date |
|---|---|---|---|---|---|---|
| ▮▮▮▮ | ▮▮▮▮ | Kerisha | Williams | | FIRST ALLIANCE HOME CARE | 03/01/2019 |
| **Terms and Conditions** | | | | | | |

Terms and Conditions Atypical Enrollment

Participation as Home Help Provider

1.As an individual provider of Home Help services, I agree that the Medicaid beneficiary is considered the employer. I am not employed by the Michigan Department Of Health and Human Services (MDHHS), the Department of Human Services (DHS), or the State of Michigan.

2.As a Home Help provider agency, I agree that the agency contract is with the Medicaid beneficiary. The agency contract is not with the Michigan Department Of Health and Human Services (MDHHS), the Department of Human Services or the State of Michigan.

3.I agree that personal care services will be provided for a Michigan Medicaid beneficiary, as authorized by the Michigan Department of Human Services (DHS) according to the DHS Adult Services Comprehensive Assessment.

4.Under Section 3504 of the Internal Revenue Code, I agree to accept the Michigan Department Of Health and Human Services (MDHHS) as the acting agent of the beneficiary for the deduction of withholding of FICA taxes. I understand that federal, state and city taxes are not withheld. I further agree to accept payments issued by MDHHS as payment in full and not to seek or accept additional payments from the beneficiary or any other source.

5.I agree to return any payments received for Home Help services not provided. I understand that accepting payment for services I did not provide is fraudulent and could result in criminal charges.

6.I understand that the Home Help program is funded by Medicaid and payments will not be approved by the Department if the beneficiary's Medicaid eligibility is inactive.

7.In order to receive payment, I agree to keep and submit to MDHHS, DHS or their designee, any and all records necessary to disclose the extent of services provided to the beneficiary.

8.Upon request, I agree to provide MDHHS, DHS or their designee, any information regarding services or purchases for which payment was made.

9.Upon request, I agree to provide MDHHS, DHS or their designee, any business transaction information as specified by 42 CFR 455.105.

10.I understand I will be subject to a criminal history screening and may not qualify to be a home help provider.

11.I agree to cooperate with MDHHS, DHS or their designee, regarding any audits, investigations or inquiries related to Home Help services provided.

**Report Date:** 05/10/2023
10:05:22 AM

 Michigan Department of Health and
Human Services

Print Terms and Conditions Report

Modification Submission



12.I agree to report any changes relative to the beneficiary including but not limited to hospitalizations, nursing home stays or discontinuation of services.

13.I agree to comply with the privacy, security and confidentiality provisions of all applicable laws governing the use and disclosure of protected health information (PHI), including the privacy regulations adopted by the U.S. Department of Health and Human Services under the Health Insurance Portability and Accountability Act of 1996 (HIPAA), and Public Acts 104-191 (45 CFR parts 106 and 164, Subparts A, C, and E).

14.I agree to comply with the provisions of 42 CFR 431.107 and Act No. 280 of the Public Acts of 1939, as amended, which state the conditions and requirements under which participation in the Medical Assistance Program is allowed.

Participation as Non-Emergency Transportation Provider

Definitions:

Confidential Rider Information: Includes, but is not limited to, the rider's medical record, any information provided by a health care provider, any other personally identifying information, and any information about the time of travel, destination, or pick up location.
Department means the Michigan Department of Health and Human Services.
Driver means an individual providing Non-Emergency Medical Transportation.
Rider means the individual being transported by driver.
Service means the provision by driver of Non-Emergency Medical Transportation for rider.

Terms:

Driver agrees to abide by the following terms and conditions:

1.To act in a professional manner at all times while providing services.

2.To never make comments that are sexually explicit in nature, solicit sexual favors, or engage in sexual activity with ride.

3.To never solicit or accept controlled substances, alcohol, or medication from rider.

4.To never solicit or accept money from riders.

5.To never use alcohol, narcotics, or controlled substances, or be under their influence, while providing services to riders. Prescribed medications can be used by a driver as long as his or her duties can still be performed in a safe manner and driver has written documentation from a treating physician that the medication does not impact the ability to drive.

6.To never eat or consume any beverage while operating the vehicle or while involved in rider assistance.

7.To never smoke in the vehicle when rider is present. For purposes of this agreement, "smoke" includes electronic


cigarettes and any other product or device which emits vapor, smoke, or any similar gaseous matter of any kind.

8.To never wear any type of headphone while providing the service.

9.To be responsible for rider's personal items.

10.To provide, as appropriate to the needs of the rider, assistance with exiting the vehicle, to open and close vehicle doors when passengers enter or exit the vehicle, and to provide assistance as necessary to or from the main door of the place of destination.

11.To properly identify and announce their presence at the entrance of the building at the specified pick-up location if a curbside pick-up is not apparent, or with attending facility staff.

12.To assist the passengers in the process of being seated, including the fastening of the seat belt, when necessitated by the rider's condition.

13.To confirm, prior to allowing any vehicle to proceed, that all passengers are properly secured in their seat belts, car seats, and, when applicable, that wheelchairs and passengers who use wheelchairs are properly secured (Exception: Only a passenger who has a letter, carried on his/her person and signed by the passenger's physician, stating that the passenger's medical condition prevents the rider from using a seat belt, may be transported without a fastened seat belt and then only as allowed by state law).

14.To provide an appropriate level of assistance to passengers, when requested, or when necessitated by a passenger's condition.

15.To provide support and direction to passengers. Such assistance shall also apply to the movement of wheelchairs and mobility-limited persons as they enter or exit the vehicle using the wheelchair lift/ramp, as applicable. Such assistance shall also include stowage by the driver of mobility aids and folding wheelchairs.

16.To act in a professional manner at all times while providing services.

17.To be clean and maintain a neat appearance at all times.

18.To be polite and courteous to riders; riders shall be treated with respect and in a culturally appropriate manner when receiving transportation services. The Manager should notify the volunteer driver of any known cultural issues significant to providing transportation services.

19.To limit review of any confidential rider information to the minimum information necessary to provide the service.

20.To only use or record confidential rider information as necessary to provide the Department information necessary for the administration of the program (i.e. mileage reimbursement, if applicable).

**Report Date:** 05/10/2023
10:05:22 AM

 Michigan Department of Health and
Human Services

Print Terms and Conditions Report

Modification Submission



21. To not to retain any original or copy of any document rider shares with you for purposes of transport.

22. To not to retain any original or copy of any document that may be provided by a health care provider to driver. Driver agrees to ensure that such documentation leaves with rider.

23. To report any breach of the terms of this user agreement to the Department. This includes, but is not limited to, accidental retention of medical record or other confidential rider information.

24. To return to the Department, as soon as possible, but in no event later than 3 business days after discovery, any confidential rider information retained left with driver after completing transport of the rider.

25. To never discuss, write, or share in any other format any information specific to a rider, except as necessary to communicate with the Department or with a health care provider or other staff at a facility rider is being transported to.

26. Not input or include any confidential rider information in any computer system of any kind, except as approved by the Department. This includes personal email accounts, file transfer systems, note applications, and any other electronic system of recording data not expressly approved for use by the Department.

27. Comply with any other agreements driver has entered into with respect to this program.

28. Respect the rider's privacy by not asking for more information about the individual's condition, reason for visit, or other personal information, while providing transport services. If the rider chooses to voluntarily share this information, it is subject to the same protections described above regarding protecting rider information.

☑By checking this, I certify that I have read and that I agree and accept the enrollment conditions in the Medical Assistance Provider Enrollment & Trading Partner Agreement.

# Michigan Department of Health and Human Services

## Print Terms and Conditions Report

### Modification Submission



| Provider ID | SSO ID | SSO First Name | SSO Last Name | NPI | Provider Name | Submission Date |
|---|---|---|---|---|---|---|
| ▮▮▮▮ | ▮▮▮▮ | Kerisha | Williams | | FIRST ALLIANCE HOME CARE | 04/23/2019 |
| **Terms and Conditions** | | | | | | |

Terms and Conditions Atypical Enrollment

Participation as Home Help Provider

1.As an individual provider of Home Help services, I agree that the Medicaid beneficiary is considered the employer. I am not employed by the Michigan Department Of Health and Human Services (MDHHS), the Department of Human Services (DHS), or the State of Michigan.

2.As a Home Help provider agency, I agree that the agency contract is with the Medicaid beneficiary. The agency contract is not with the Michigan Department Of Health and Human Services (MDHHS), the Department of Human Services or the State of Michigan.

3.I agree that personal care services will be provided for a Michigan Medicaid beneficiary, as authorized by the Michigan Department of Human Services (DHS) according to the DHS Adult Services Comprehensive Assessment.

4.Under Section 3504 of the Internal Revenue Code, I agree to accept the Michigan Department Of Health and Human Services (MDHHS) as the acting agent of the beneficiary for the deduction of withholding of FICA taxes. I understand that federal, state and city taxes are not withheld. I further agree to accept payments issued by MDHHS as payment in full and not to seek or accept additional payments from the beneficiary or any other source.

5.I agree to return any payments received for Home Help services not provided. I understand that accepting payment for services I did not provide is fraudulent and could result in criminal charges.

6.I understand that the Home Help program is funded by Medicaid and payments will not be approved by the Department if the beneficiary's Medicaid eligibility is inactive.

7.In order to receive payment, I agree to keep and submit to MDHHS, DHS or their designee, any and all records necessary to disclose the extent of services provided to the beneficiary.

8.Upon request, I agree to provide MDHHS, DHS or their designee, any information regarding services or purchases for which payment was made.

9.Upon request, I agree to provide MDHHS, DHS or their designee, any business transaction information as specified by 42 CFR 455.105.

10.I understand I will be subject to a criminal history screening and may not qualify to be a home help provider.

11.I agree to cooperate with MDHHS, DHS or their designee, regarding any audits, investigations or inquiries related to Home Help services provided.


12.I agree to report any changes relative to the beneficiary including but not limited to hospitalizations, nursing home stays or discontinuation of services.

13.I agree to comply with the privacy, security and confidentiality provisions of all applicable laws governing the use and disclosure of protected health information (PHI), including the privacy regulations adopted by the U.S. Department of Health and Human Services under the Health Insurance Portability and Accountability Act of 1996 (HIPAA), and Public Acts 104-191 (45 CFR parts 106 and 164, Subparts A, C, and E).

14.I agree to comply with the provisions of 42 CFR 431.107 and Act No. 280 of the Public Acts of 1939, as amended, which state the conditions and requirements under which participation in the Medical Assistance Program is allowed.

Participation as Non-Emergency Transportation Provider

Definitions:

Confidential Rider Information: Includes, but is not limited to, the rider's medical record, any information provided by a health care provider, any other personally identifying information, and any information about the time of travel, destination, or pick up location.
Department means the Michigan Department of Health and Human Services.
Driver means an individual providing Non-Emergency Medical Transportation.
Rider means the individual being transported by driver.
Service means the provision by driver of Non-Emergency Medical Transportation for rider.

Terms:

Driver agrees to abide by the following terms and conditions:

1.To act in a professional manner at all times while providing services.

2.To never make comments that are sexually explicit in nature, solicit sexual favors, or engage in sexual activity with ride.

3.To never solicit or accept controlled substances, alcohol, or medication from rider.

4.To never solicit or accept money from riders.

5.To never use alcohol, narcotics, or controlled substances, or be under their influence, while providing services to riders. Prescribed medications can be used by a driver as long as his or her duties can still be performed in a safe manner and driver has written documentation from a treating physician that the medication does not impact the ability to drive.

6.To never eat or consume any beverage while operating the vehicle or while involved in rider assistance.

7.To never smoke in the vehicle when rider is present. For purposes of this agreement, "smoke" includes electronic



cigarettes and any other product or device which emits vapor, smoke, or any similar gaseous matter of any kind.

8.To never wear any type of headphone while providing the service.

9.To be responsible for rider's personal items.

10.To provide, as appropriate to the needs of the rider, assistance with exiting the vehicle, to open and close vehicle doors when passengers enter or exit the vehicle, and to provide assistance as necessary to or from the main door of the place of destination.

11.To properly identify and announce their presence at the entrance of the building at the specified pick-up location if a curbside pick-up is not apparent, or with attending facility staff.

12.To assist the passengers in the process of being seated, including the fastening of the seat belt, when necessitated by the rider's condition.

13.To confirm, prior to allowing any vehicle to proceed, that all passengers are properly secured in their seat belts, car seats, and, when applicable, that wheelchairs and passengers who use wheelchairs are properly secured (Exception: Only a passenger who has a letter, carried on his/her person and signed by the passenger's physician, stating that the passenger's medical condition prevents the rider from using a seat belt, may be transported without a fastened seat belt and then only as allowed by state law).

14.To provide an appropriate level of assistance to passengers, when requested, or when necessitated by a passenger's condition.

15.To provide support and direction to passengers. Such assistance shall also apply to the movement of wheelchairs and mobility-limited persons as they enter or exit the vehicle using the wheelchair lift/ramp, as applicable. Such assistance shall also include stowage by the driver of mobility aids and folding wheelchairs.

16.To act in a professional manner at all times while providing services.

17.To be clean and maintain a neat appearance at all times.

18.To be polite and courteous to riders; riders shall be treated with respect and in a culturally appropriate manner when receiving transportation services. The Manager should notify the volunteer driver of any known cultural issues significant to providing transportation services.

19.To limit review of any confidential rider information to the minimum information necessary to provide the service.

20.To only use or record confidential rider information as necessary to provide the Department information necessary for the administration of the program (i.e. mileage reimbursement, if applicable).


21. To not to retain any original or copy of any document rider shares with you for purposes of transport.

22. To not to retain any original or copy of any document that may be provided by a health care provider to driver. Driver agrees to ensure that such documentation leaves with rider.

23. To report any breach of the terms of this user agreement to the Department. This includes, but is not limited to, accidental retention of medical record or other confidential rider information.

24. To return to the Department, as soon as possible, but in no event later than 3 business days after discovery, any confidential rider information retained left with driver after completing transport of the rider.

25. To never discuss, write, or share in any other format any information specific to a rider, except as necessary to communicate with the Department or with a health care provider or other staff at a facility rider is being transported to.

26. Not input or include any confidential rider information in any computer system of any kind, except as approved by the Department. This includes personal email accounts, file transfer systems, note applications, and any other electronic system of recording data not expressly approved for use by the Department.

27. Comply with any other agreements driver has entered into with respect to this program.

28. Respect the rider's privacy by not asking for more information about the individual's condition, reason for visit, or other personal information, while providing transport services. If the rider chooses to voluntarily share this information, it is subject to the same protections described above regarding protecting rider information.

☑By checking this, I certify that I have read and that I agree and accept the enrollment conditions in the Medical Assistance Provider Enrollment & Trading Partner Agreement.



| Provider ID | SSO ID | SSO First Name | SSO Last Name | NPI | Provider Name | Submission Date |
|---|---|---|---|---|---|---|
| | | Kerisha | Williams | | FIRST ALLIANCE HOME CARE | 05/29/2020 |
| **Terms and Conditions** | | | | | | |

Terms and Conditions Atypical Enrollment

Participation as Home Help Provider

1.As an individual provider of Home Help services, I agree that the Medicaid beneficiary is considered the employer. I am not employed by the Michigan Department Of Health and Human Services (MDHHS), the Department of Human Services (DHS), or the State of Michigan.

2.As a Home Help provider agency, I agree that the agency contract is with the Medicaid beneficiary. The agency contract is not with the Michigan Department Of Health and Human Services (MDHHS), the Department of Human Services or the State of Michigan.

3.I agree that personal care services will be provided for a Michigan Medicaid beneficiary, as authorized by the Michigan Department of Human Services (DHS) according to the DHS Adult Services Comprehensive Assessment.

4.Under Section 3504 of the Internal Revenue Code, I agree to accept the Michigan Department Of Health and Human Services (MDHHS) as the acting agent of the beneficiary for the deduction of withholding of FICA taxes. I understand that federal, state and city taxes are not withheld. I further agree to accept payments issued by MDHHS as payment in full and not to seek or accept additional payments from the beneficiary or any other source.

5.I agree to return any payments received for Home Help services not provided. I understand that accepting payment for services I did not provide is fraudulent and could result in criminal charges.

6.I understand that the Home Help program is funded by Medicaid and payments will not be approved by the Department if the beneficiary's Medicaid eligibility is inactive.

7.In order to receive payment, I agree to keep and submit to MDHHS, DHS or their designee, any and all records necessary to disclose the extent of services provided to the beneficiary.

8.Upon request, I agree to provide MDHHS, DHS or their designee, any information regarding services or purchases for which payment was made.

9.Upon request, I agree to provide MDHHS, DHS or their designee, any business transaction information as specified by 42 CFR 455.105.

10.I understand I will be subject to a criminal history screening and may not qualify to be a home help provider.

11.I agree to cooperate with MDHHS, DHS or their designee, regarding any audits, investigations or inquiries related to Home Help services provided.



12.I agree to report any changes relative to the beneficiary including but not limited to hospitalizations, nursing home stays or discontinuation of services.

13.I agree to comply with the privacy, security and confidentiality provisions of all applicable laws governing the use and disclosure of protected health information (PHI), including the privacy regulations adopted by the U.S. Department of Health and Human Services under the Health Insurance Portability and Accountability Act of 1996 (HIPAA), and Public Acts 104-191 (45 CFR parts 106 and 164, Subparts A, C, and E).

14.I agree to comply with the provisions of 42 CFR 431.107 and Act No. 280 of the Public Acts of 1939, as amended, which state the conditions and requirements under which participation in the Medical Assistance Program is allowed.

Participation as Non-Emergency Transportation Provider

Definitions:

Confidential Rider Information: Includes, but is not limited to, the rider's medical record, any information provided by a health care provider, any other personally identifying information, and any information about the time of travel, destination, or pick up location.
Department means the Michigan Department of Health and Human Services.
Driver means an individual providing Non-Emergency Medical Transportation.
Rider means the individual being transported by driver.
Service means the provision by driver of Non-Emergency Medical Transportation for rider.

Terms:

Driver agrees to abide by the following terms and conditions:

1.To act in a professional manner at all times while providing services.

2.To never make comments that are sexually explicit in nature, solicit sexual favors, or engage in sexual activity with ride.

3.To never solicit or accept controlled substances, alcohol, or medication from rider.

4.To never solicit or accept money from riders.

5.To never use alcohol, narcotics, or controlled substances, or be under their influence, while providing services to riders. Prescribed medications can be used by a driver as long as his or her duties can still be performed in a safe manner and driver has written documentation from a treating physician that the medication does not impact the ability to drive.

6.To never eat or consume any beverage while operating the vehicle or while involved in rider assistance.

7.To never smoke in the vehicle when rider is present. For purposes of this agreement, "smoke" includes electronic


cigarettes and any other product or device which emits vapor, smoke, or any similar gaseous matter of any kind.

8.To never wear any type of headphone while providing the service.

9.To be responsible for rider's personal items.

10.To provide, as appropriate to the needs of the rider, assistance with exiting the vehicle, to open and close vehicle doors when passengers enter or exit the vehicle, and to provide assistance as necessary to or from the main door of the place of destination.

11.To properly identify and announce their presence at the entrance of the building at the specified pick-up location if a curbside pick-up is not apparent, or with attending facility staff.

12.To assist the passengers in the process of being seated, including the fastening of the seat belt, when necessitated by the rider's condition.

13.To confirm, prior to allowing any vehicle to proceed, that all passengers are properly secured in their seat belts, car seats, and, when applicable, that wheelchairs and passengers who use wheelchairs are properly secured (Exception: Only a passenger who has a letter, carried on his/her person and signed by the passenger's physician, stating that the passenger's medical condition prevents the rider from using a seat belt, may be transported without a fastened seat belt and then only as allowed by state law).

14.To provide an appropriate level of assistance to passengers, when requested, or when necessitated by a passenger's condition.

15.To provide support and direction to passengers. Such assistance shall also apply to the movement of wheelchairs and mobility-limited persons as they enter or exit the vehicle using the wheelchair lift/ramp, as applicable. Such assistance shall also include stowage by the driver of mobility aids and folding wheelchairs.

16.To act in a professional manner at all times while providing services.

17.To be clean and maintain a neat appearance at all times.

18.To be polite and courteous to riders; riders shall be treated with respect and in a culturally appropriate manner when receiving transportation services. The Manager should notify the volunteer driver of any known cultural issues significant to providing transportation services.

19.To limit review of any confidential rider information to the minimum information necessary to provide the service.

20.To only use or record confidential rider information as necessary to provide the Department information necessary for the administration of the program (i.e. mileage reimbursement, if applicable).



21. To not to retain any original or copy of any document rider shares with you for purposes of transport.

22. To not to retain any original or copy of any document that may be provided by a health care provider to driver. Driver agrees to ensure that such documentation leaves with rider.

23. To report any breach of the terms of this user agreement to the Department. This includes, but is not limited to, accidental retention of medical record or other confidential rider information.

24. To return to the Department, as soon as possible, but in no event later than 3 business days after discovery, any confidential rider information retained left with driver after completing transport of the rider.

25. To never discuss, write, or share in any other format any information specific to a rider, except as necessary to communicate with the Department or with a health care provider or other staff at a facility rider is being transported to.

26. Not input or include any confidential rider information in any computer system of any kind, except as approved by the Department. This includes personal email accounts, file transfer systems, note applications, and any other electronic system of recording data not expressly approved for use by the Department.

27. Comply with any other agreements driver has entered into with respect to this program.

28. Respect the rider's privacy by not asking for more information about the individual's condition, reason for visit, or other personal information, while providing transport services. If the rider chooses to voluntarily share this information, it is subject to the same protections described above regarding protecting rider information.


☑By checking this, I certify that I have read and that I agree and accept the enrollment conditions in the Medical Assistance Provider Enrollment & Trading Partner Agreement.

# Exhibit 2

**OVERVIEW**

The Home Help program, administered by the Michigan Department of Health and Human Services (MDHHS), provides personal care services to individuals who need hands-on assistance with activities of daily living (ADLs) and assistance with instrumental activities of daily living (IADLs). MDHHS is responsible for approving Home Help agency providers for participation in the program; see the Medicaid Provider Manual.

**DEFINITIONS**

### Agency Caregiver

A direct care worker employed by the agency provider. This individual provides personal care services to an MDHHS Home Help client.

### Agency Employee

An employee of a Home Help agency who has access to information regarding a Home Help client for the purposes of billing, answering phone calls, or assisting with setting up services for MDHHS Home Help clients.

### Agency Owner

Possesses five percent or greater direct or indirect ownership interest of the agency and/or person with control interest.

### Agency Provider

Must meet any one of the criteria below:

- A current Medicare certified Home Health agency with Medicare certification and a federal taxpayer identification number (TIN).

- An approved agency with a TIN that directly employs all (but not less than two) agency caregivers, not including the owner, who are providing services through the Home Help program and regularly receiving a monthly paycheck.

- A Community Mental Health Services Program (CMHSP) that works with clients who use arrangements that support self-determination.

### Agency Representative/Resident Agent

An individual who is authorized to act on behalf of the agency owner.

### Board of Directors

A group of individuals elected or selected to function as representatives of the shareholders to establish corporate management-related policies and to make decisions on major company issues.

### Client

A Medicaid beneficiary who is receiving services through the MDHHS Home Help program.

### Managing Employee

A general manager, business manager, administrator, director, or other individual who exercises operational or managerial control over, or who directly or indirectly conducts the day-to-day operation of the institution, organization, or agency, either under contract or through some other arrangement, whether or not the individual is a W-2 employee.

## PROVIDER OPERATION STANDARDS

### Employee Identification

Agency caregivers and agency employees who have direct contact with clients must carry and present a state or Home Help agency issued photo identification whenever they enter a client's home. In addition, agency caregivers must show identification whenever requested by the MDHHS adult services worker (ASW) or other MDHHS staff working in collaboration with the Home Help program.

### Criminal History Screening

Agency owners, agency caregivers, and agency employees who have access to the MDHHS Home Help clients' home or personal information are subject to criminal history screenings and program exclusions consistent with the provisions outlined in current Home

Help policy. Home Help agency caregivers and agency employees must also associate in CHAMPS to the agency where they are employed. The date of this association should not be earlier than the date the criminal history check was completed to protect client safety.

Agency caregivers and agency employees who do not meet the criminal history criteria may continue to work for the agency but cannot provide Home Help services funded by MDHHS through the Home Help program. Agency caregivers and agency employees with a criminal history will not have the option of continuing services by having a Home Help client complete the MSA-119, Personal Choice and Acknowledgement of Provider Selection, form.

## Required Contacts

### Required Contact between Agency Representative and Resident Agents and ASW

The ASW must meet with Home Help clients every six months to complete a review of client needs. Part of this review process involves a conversation between the agency caregiver who is providing the direct hands-on care to the Home Help client and the ASW. This contact will be initiated by the ASW but may require follow-up with the agency caregiver if the initial attempt is unsuccessful. At least once per year, this contact must be an in-person face-to-face contact between the ASW and the agency caregiver.

**Note:**  If the agency is just beginning services with a client, the initial contact may be with either the agency owner and/or the agency caregiver. Once services have begun, subsequent contact must be with the agency caregiver who is providing the direct hands-on care to the Home Help client. Failure to cooperate with these requirements can result in suspension of payment to the agency.

The ASW will explain the following points with the Home Help client and agency caregiver:

- Home Help services are a benefit to the client and earnings to the agency provider.

- Report **all** earned income to the IRS; see www.irs.gov.

- The client employs the agency provider **not** the State of Michigan.

- As the employer, the Home Help client has the right to hire and fire the agency provider.

- Medicaid funds the Home Help program and will not authorize payments if the Home Help client's Medicaid eligibility is inactive.

- The Home Help client and/or agency provider is responsible for notifying the ASW within **10-business days** of any change; including but not limited to hospitalizations, nursing home, or adult foster care admissions.

- The client and/or agency provider is responsible for notifying the ASW within **10-business days** of a change in agency provider and/or agency caregiver or discontinuation of services. Payments must only be authorized to the agency providing approved services.

- If the agency named on the warrant does not provide services or the agency only provides services for a portion of the authorized period, the agency must return the warrant.

  **Note:** Failure to comply with any of the above may be considered fraudulent or require recoupment.

### *MSA-4676 Home Help Services Agreement*

The Home Help client **and** agency provider **must** sign the MSA-4676 Home Help Services Agreement, **before** payments are authorized. ASWs should not create a payment authorization for a new case opening or change in provider until receipt of the signed MSA-4676. However, the signature date on the MSA-4676 does not impact the case opening date or the start date of the payment authorization.

**Note:** Verbal attestation of the MSA-4676, Home Help Statement of Employment, is acceptable during the COVID-19 Public Health Emergency from 04/01/2020 through 05/11/2023.

The ASW will make two copies of the completed and signed form, along with two copies of the MDHHS-6064-C, Client Time and Task Management form and the MDHHS-6064-P, Provider Time and Task Management form and distribute as follows:

- Give one copy of the MSA-4676 and the current MDHHS-6064-C, Client Time and Task Management and the MDHHS-

6064-P, Provider Time and Task Management form to the Home Help client.

- Give one copy of the MSA-4676 and the MDHHS-6064-P, Provider Time and Task Management form to the agency provider.

- Retain the **original** MSA-4676 in the client's case record.

  For additional information regarding the MSA-4676 see: [ASM 135, Home Help Caregivers](#), subsection; MSA-4676 Home Help Services Agreement and Distribution.

**Recruitment and Marketing**

Recruitment of caregivers or clients is not allowed on MDHHS premises. Home Help agencies may not use materials developed by MDHHS in advertising, marketing, or recruitment in a manner that misrepresents the Home Help agency's relationship with the state or the Home Help program. The use of the MDHHS logo on agency documents is prohibited. Agencies are not allowed to recruit or direct their advertising to Medicaid beneficiaries and/or their active individual caregivers who are already receiving Home Help services through MDHHS. An agency caregiver may not provide services to a Home Help client who they were assisting as an individual caregiver for 90-days after commencement of employment with the agency or for 90-days after termination of services as the client's individual caregiver, whichever comes later.

**Example:**  Mrs. Smith is a Home Help client. She uses her adult daughter, Becky, as her Home Help individual caregiver. Becky recently had contact with a Home Help agency and would like to work for the agency. Her start date is May 1st. Becky may work for the agency and care for other clients as of May 1st. She may also continue as an individual caregiver for her mother, Mrs. Smith. If the agency wants to take Mrs. Smith as a client, they can assign a different agency caregiver for her care. Becky will not be able to care for Mrs. Smith through the agency until there is at least a 90-day break in service. Therefore, in this case, if Mrs. Smith began with the agency on May 1st, her daughter, Becky, could not be her agency caregiver until July 30th, which would be 90 days.

Agencies may conduct standard employee recruitment (for example, posting openings) and general advertising outside of MDHHS offices and off MDHHS premises.

**Non-Competition Conditions**

The agency provider will neither have, nor enforce, any agreements or requirements that prohibit an agency caregiver or agency employee from working with a different Home Help client or for another Home Help agency during or after ending employment, regardless of when the agreement was signed.

**Payment for Services**

Home Help agencies must directly employ all agency caregivers and agency employees who work with Home Help clients, unless the agency is a Medicare certified Home Health agency with Medicare certification and a TIN, or a Community Mental Health Services Program doing self-determination arrangements. Agency caregivers and agency employees may not subcontract services to someone not directly employed by the agency. All agency caregivers and agency employees must be enrolled in CHAMPS and associated to the Home Help agency prior to providing Home Help services so that a criminal history check is completed.

Agencies will accept the authorized Home Help payment as payment in full for Home Help services rendered. Clients shall not be required or solicited to supplement Home Help payments for the same services authorized by MDHHS.

**Record Retention**

Agencies must maintain supporting documentation verifying that services billed to MDHHS were provided to the client. At a minimum, this includes verification of days and times worked, tasks completed, and names of clients the provider worked for each day. The agency provider must keep a copy of the approved MDHHS-6064-P, Provider Time and Task Management form for each client and the BPHASA-2421, Live In Attestation form if applicable; see ASM 143, Electronic Visit Verification. Keep records for seven years from the date of service.

Providers must, upon request from authorized agents of the state or federal government, make available for examination and photocopying all medical records, quality assurance documents, financial records, administrative records, and other documents and records that must be maintained. Failure to make requested records available for examination and duplication and/or extraction

through the method determined by authorized agents of the state or federal government may result in the provider's suspension and/or termination from Medicaid. Failure to produce supporting documentation for claims may also result in recoupment of Home Help payments made to the agency.

**APPROVED AGENCY ENROLLMENT**

### Approval Process for New Agencies

New provider agencies must:

- Have a federal employer identification number (EIN).
- Submit the following documents to the MDHHS Home Help unit:

    - A letter of intent signed by the agency owners(s) specifying what services the agency will be providing. The letter must include:

        - Contact information for the Home Help agency owner and managing employee. If the owner is the managing employee, note this in the letter.

        - If the agency is managed by a separate individual, their contact information needs to be included.

            **Note:** Contact information includes email, phone number, and agency owner's home address.

        - The letter needs to specify that these individuals will ensure that the agency and the agency's caregivers and employees have read all current MDHHS Home Help policies and procedures and will provide services in compliance with those requirements.

    - Copies of the Internal Revenue Service (IRS) form W-4, Employee's Withholding Allowance Certificate, for all agency caregivers and agency employees. This verifies that all caregivers and employees involved in the Home Help program are directly employed by the agency.

    - Register with the Department of Licensing and Regulatory Affairs (LARA) or county clerk's office and then submit to MDHHS the articles of organization or similar documents.

**Note:** Any documents other than the articles of organization must be in a format approved by the Home Help unit.

- Provide all additional documents listed below, if an agency has not been operating previously in the Michigan Medicaid Home Help program:

  - A current copy of the IRS Form-941, Employer's Quarterly Federal Tax Return, or relevant filing statement demonstrating current compliance with the Federal Insurance Contributions Act (FICA) tax.

  - A current copy of form UIA-1028, Employer's Quarterly Wage/Tax Report, or a similar form demonstrating the agency's current compliance of state unemployment insurance filings and payment.

  - A list of current caregivers and employees who work for the agency and will provide services for Home Help clients. The list should include caregiver/employee name, date of birth, and Community Health Automated Medicaid Processing System (CHAMPS) provider ID number.

  - A copy of W-4s for all current Home Help agency caregivers and employees.

  - A copy of the IRS form W-9, Request for Taxpayer Identification Number and Certification, for the agency.

- A current Medicare certified Home Health agency is only required to provide a letter of intent and a copy of the current Medicare certification.

Submit all required documentation described above to:

MDHHS Home Help Unit
Capitol Commons Center, 5th Floor
400 S. Pine St.
Lansing, MI 48933
Email: MDHHS-HHAgencyAudits@Mighian.gov
Fax: 1-517-241-0067

**Note:** Agencies should email documents to the email address listed above with the subject line of 'agency application'. This enables staff to quickly identify these documents and confirm

26-04065-mlo    Doc 1    Filed 02/26/26    Entered 02/26/26 09:45:52    Page 63 of 101

receipt. Fax and postal mail are acceptable; however, confirmation of documents receipt will not be available.

- Agencies must register their vendor account with the State of Michigan by visiting the Sigma Vendor Self Services website at www.michigan.gov/SIGMAVSS. See SOM VSS User Guide for New Vendors reference document for further instructions. Agency providers should keep a record of the new Vendor Customer ID, download and print the substitute W-9 form for agency records, and submit a copy of the form to MDHHS by one of the methods stated above.

- Home Help agencies involved in the Home Help program must register in CHAMPS and have a criminal history screening done prior to delivering services or working with MDHHS Home Help clients. Instructions on how to complete this process are located on the MDHHS website at www.michigan.gov/homehelp or by calling Provider Support Services at 1-800-979-4662.

- Agencies must revalidate their CHAMPS registration information a minimum of once every five years, or more often if requested by MDHHS.

- If the agency fails to submit the CHAMPS application within 60 days of the application start date, the agency application will be denied.

**Note:**  Upon CHAMPS approval from MDHHS, all agency caregivers and agency employees working with the Home Help program must also register in CHAMPS, pass a criminal history screening, and be associated to the agency provider using the seven-digit provider ID number assigned to the Home Help Agency.

### Agency Enrollment, Approval, or Denial

The agency provider will be notified in writing of its approval, denial, or the need for additional information within 30 calendar days of all required documents being received. Application directions are online at: www.michigan.gov/homehelp.

An agency provider shall be denied enrollment if any of the agency owners, agency representatives/resident agents, or managing employees had direct or indirect ownership interest and/or control interest of a Home Help agency that was suspended or terminated

from the Michigan Medicaid program within the preceding five years.

**Additional Verification Needed for New Agencies**

Within 120 days of agency approval, the agency must submit the following documentation to the MDHHS Home Help unit:

- A letter identifying the agency owner(s) and administrator, along with their contact information (to include address, phone number, and e-mail information).

- A copy of the most recent IRS Form-941 demonstrating that the FICA tax is paid on a quarterly basis.

- A copy of the most recent form UIA-1028 or a similar form demonstrating the agency's payment of state unemployment insurance.

- Copies of IRS form W-4 for all agency caregivers who are currently providing services to Home Help clients.

- A list of all agency caregivers and agency employees who are currently providing services to Home Help clients, including their first and last name, date of birth, and their CHAMPS provider ID number. This list should match the providers currently listed in CHAMPS and associated to the Home Help agency.

**Reporting**

Agencies must report all changes affecting agency provider enrollment by updating agency information in CHAMPS. This includes, but is not limited to, changes in agency ownership, address, contact name, telephone number, email, or an agency caregiver or employee. Failure to notify MDHHS within 10 calendar days of the change may result in the termination of the agency provider's enrollment, a reduction from the agency provider reimbursement rates to individual provider rates, or the denial of claims for services provided.

The MDHHS Home Help unit will audit employment documents for a sample of agencies each year. An agency selected for an audit must provide current copies of the employment documents cited in this item under the agency enrollment section along with supporting verifications of services related to a specific payment. Agencies must submit the requested information within 30 calendar days to

MDHHS. Failure to provide documents by the due date may result in a reduction of payment rate. Failure to provide the required documents within 60 calendar days will result in the agency being removed from the approved Home Help agency list for a minimum of 30 calendar days or until compliance, whichever is longer.

Other authorized areas within MDHHS may also request documents or other records needed for the Home Help program. Agencies must follow the timelines specified in those requests.

**APPROVED AGENCY DISENROLLMENT**

When an agency is disenrolled, any authorizations for Home Help payments are terminated in the state payment system. Notice is sent to the agency provider and the local MDHHS office within 10 calendar days of the MDHHS determination of disenrollment. MDHHS may disenroll an agency for any of the following reasons:

- An agency may be disenrolled if the agency or any of its caregivers or employees are found guilty of Medicaid fraud or client abuse, neglect, or exploitation.

- An agency may be disenrolled for falsifying information in its application documents, provider agreement, quarterly reporting, service verification, or billing.

- An agency may be disenrolled if the agency owner(s), agency representative/resident agent, or member of the board of directors has a mandatory or permissive criminal conviction as outlined in MSA Bulletin 19-03.

**Note:** As of April 1, 2019, when determining the eligibility of a caregiver with a permissive exclusion, Provider Enrollment will only look at a 10 year look back period for felonies and a 5 year look back period for misdemeanors. The policy on mandatory exclusion has not changed; see ASM 135, Home Help Caregivers.

- An agency may be disenrolled for failing to report changes or update CHAMPS within 10 calendar days of the change.

- An agency may be disenrolled if it fails to meet any of the requirements in this policy.

An agency may be suspended if it is being investigated for fraud, abuse, neglect, or exploitation, pending the outcome of the investigation.

**Approved Agency List**

MDHHS maintains a list of agencies approved to provide Home Help services to MDHHS clients. Agencies must be on the approved agency list to be eligible for the agency rate. These lists are updated monthly and posted on the Adult Services home page, to use as a resource when clients are looking for providers. MDHHS may remove an agency from the approved agency list for the following reasons:

- An agency has not provided Home Help services within the last six months.

- An agency fails to meet any of the requirements in this policy.

- An agency fails to meet any of the requirements in this policy not already listed under the disenrollment section in this item.

Agencies removed from the approved agency list may still be coded as an agency in CHAMPS and will be eligible to provide services at the individual rate for Home Help. Agencies that would like to be reinstated as an approved Home Help agency provider should send an email to MDHHS-HHAgencyAudits@Michigan.gov to request information on how to become reinstated.

**Participation as an Agency Provider**

Participation in the Home Help program as an agency provider is subject to denial, suspension, or termination in accordance with MCL 400.111e.

**Appeals**

Agency providers and applicants have the right to appeal any adverse action taken by MDHHS. The appeal process is subject to the Social Welfare Act. PA 280 of 1939; MCL 400.01 et seq., Chapter 4 and 6 of the Administrative Procedures Act of 1969: MCL 24.271 to 24.287 and MCL 24.301 to 24.306, and the Michigan Administrative Code regarding Medical Services Administration (MSA) Provider Hearing (R 400.3401- 400.3425 and R 792.10904 - 792.10906).

**Existing Agencies**

MDHHS will inform an agency provider of disenrollment through an adverse action notice (also known as a negative action notice). The agency may appeal within 30-calendar days of the notice to the Michigan Office of Administrative Hearings and Rules (MOAHR). Existing agency providers may continue to provide services during the appeal period if the agency provider accepts the responsibility of the repayment of funds should the MDHHS decision be upheld. The agency provider may not accept new Medicaid Home Help clients during the appeal period. During this time, the Home Help client continues to have the right to terminate the agency provider at any time and without cause.

**Note:**  The process described above may not reflect actions taken on behalf of MDHHS by the MDHHS Office of Inspector General (OIG). An agency provider suspended from the Home Help program by OIG cannot operate during the suspension and has 15-calendar days to appeal the OIG decision.

**New Agency Applicants**

MDHHS will inform new agency provider applicants of ineligibility factors identified through screening and/or evaluation. The agency provider may appeal within 30-calendar days of notification of being denied or of losing approved agency status to MOAHR. New agencies denied enrollment during the screening application process are not eligible to receive MDHHS payment for Home Help services during the appeal period.

**Local Office Home Help Agency Provider Hourly Rate**

Each local MDHHS office has an established agency Home Help provider rate. ASWs must **not** authorize above or below the established county rate. For the list of individual and agency hourly rates see; ASM 138, County Rates.

**REFERENCES**

See ASM 135, Home Help Caregivers.

See ASM 138, County Rates.

See ASM 143, Electronic Visit Verification.

## CONTACT

For questions contact MDHHS-Home-Help-Policy@michigan.gov.

# Exhibit 3

## OVERVIEW

The Michigan Department of Health and Human Services (MDHHS) is responsible for determining accurate payment for services. When payments are made in an amount greater than allowed under department policy an overpayment occurs. When an overpayment is discovered, corrective actions must be taken to prevent further overpayment and to recoup the overpayment amount.

## OVERPAYMENT TYPES

The overpayment type identifies the cause of an overpayment:

- Client errors.
- Provider errors.
- Administrative or departmental errors.
- Administrative hearing upheld the department's decision.

Appropriate action must be taken when any of these overpayments occur.

### Client Errors

A client error occurs when the client receives additional benefits than they were entitled to because the client provided incorrect or incomplete information to MDHHS.

A client error also exists when the client's timely request for a hearing results in deletion of a negative action issued by the department and one of the following occurs:

- The hearing request is later withdrawn.

- The Michigan Office of Administrative Hearings and Rules (MOAHR) denies the hearing request.

- The client or authorized representative fails to appear for the hearing and MOAHR gives the department written instructions to proceed with the negative action.

- The hearing decision upholds the department's actions.

26-04065-mlo   Doc 1   Filed 02/26/26   Entered 02/26/26 09:45:52   Page 71 of 101

### Intentional Client Overpayment

A client error can be deemed as intentional or unintentional. If the client error is determined to be intentional, see ASM 166, Fraud - Intentional Program Violation.

### Unintentional Client Overpayment

Unintentional client overpayments occur with either of the following:

- The client is unable to understand and/or perform their reporting responsibilities due to physical or mental impairment.

- The client has a justifiable explanation for not giving correct or full information.

All instances of unintentional client error must be recouped. **No fraud referral is necessary**.

**Individual Caregiver and Agency Provider Errors**

Individual caregivers and agency providers are responsible for correct billing procedures. Individual caregivers and agency providers must bill for hours and services delivered to the client that have been approved by the adult services worker. Individual caregivers and agency providers are responsible for refunding overpayments resulting from an inaccurate submission of hours. Failure to bill correctly or refund an overpayment is an individual caregiver or agency provider error.

**Example:** Client was hospitalized for several days and the individual caregiver or agency provider failed to report changes in service hours resulting in an overpayment.

Individual caregiver and agency provider errors can be deemed as intentional or unintentional. If the individual caregiver or agency provider error is determined to be intentional; see ASM 166, Fraud - Intentional Program Violation.

All instances of unintentional provider error must be recouped. **No fraud referral is necessary.**

26-04065-mlo    Doc 1    Filed 02/26/26    Entered 02/26/26 09:45:52    Page 72 of 101

**Administrative Errors**

An administrative error is caused by incorrect actions by MDHHS.

### Computer or Mechanical Process Errors

A computer or mechanical process may fail to generate the correct payment amount to the client, individual caregiver, and/or agency provider resulting in an over payment. The adult services worker (ASW) must determine who to initiate recoupment from depending on the payment type (dual-party warrant or single-party warrant).

### Adult Services Worker (ASW) Errors

An ASW error may lead to an authorization for more services than the client is entitled to receive. The individual caregiver or agency provider then delivers, in good faith, the services for which the client was not entitled to. Based on the ASW's error, when this occurs, no recoupment is necessary.

**Note:** If overpayment occurs and services were **not** provided, recoupment must occur.

**Example:** If the ASW made an error in MiAIMS while inputting the time for the Functional Assessment, creating additional hours on the time and task, and the individual caregiver or agency provider worked the approved hours on the time and task, recoupment is **not** needed.

**Administrative Hearing Overpayments**

A client has 90 days to request an administrative hearing regarding a negative action. When a client requests the administrative hearing before the negative action effective date, the proposed negative action is delayed pending the outcome of the hearing.

Overpayments result when one of the following occurs:

- The hearing request is withdrawn.
- The client fails to appear for the hearing.
- The department's negative action is upheld.

When any of the above takes place, the ASW must begin the recoupment process for any overpayments that occurred after the effective date of the negative action.

## CENTRAL OFFICE REPORTS TO PREVENT FRAUD, WASTE, AND ABUSE

The Home Help Policy Section will generate monthly reports to identify and prevent fraud, waste, and abuse of Medicaid funds. The ASW will be responsible for reviewing the information in the report to determine if an overpayment occurred. If the ASW discovers that the client was not eligible for services, the ASW must process a recoupment regardless of the dollar amount. If no recoupment is necessary, the ASW must document in MiAIMS the reason the recoupment was not needed.

**Example:** "A review of the client's payment history shows no services were billed for hospitalization dates of May 5-10, 2019; no recoupment needed."

## PREVENTION OF OVERPAYMENTS

During the initial assessment and subsequent case reviews the adult services worker must inform the client, individual caregiver, and/or agency provider of their reporting responsibilities. The ASW must act on information reported if lack of services could result in an overpayment occurring. The client, individual caregiver, and/or agency provider should be reminded of the following:

- Home Help clients are required to give complete and accurate information about their circumstances.

- Home Help clients, individual caregivers, and agency providers are required to notify the adult services worker within **10 business days** of any changes including, but not limited to, hospitalization, nursing home, or adult foster care/home for the aged admissions.

- The client, individual caregiver, and/or agency provider agree to repay or return any payments issued in error to the State of Michigan for Home Help services not rendered.

- A timely hearing request can suspend a proposed reduction in the approved cost of care. However, the client must repay the overpayment amount if either:

  •• The hearing request is later withdrawn.

  •• The Michigan Office of Administrative Hearings and Rules (MOAHR) denies the hearing request.

  •• The client or authorized representative for the hearing fails to appear for the hearing and MOAHR gives the department written instructions to proceed with the negative action.

  •• The hearing decision upholds the department's actions.

### Terms and Conditions

All Home Help individual caregivers and agency providers agree to a series of terms and conditions upon enrollment in the Community Health Automated Medicaid Processing System (CHAMPS). Home Help individual caregivers agree to terms and conditions monthly when submitting their electronic service verification (ESV) in CHAMPS.

Individual caregivers who submit monthly paper service verification (PSV) receive a cover letter with a list of terms and conditions. By signing the PSV, the individual caregiver understands and agrees to the terms and conditions.

## RECOUPMENT METHODS FOR ADULT SERVICES PROGRAMS

The MDHHS Medicaid Collections Unit (MCU) is responsible for recoupment of overpayments for the adult services programs. The adult services worker is responsible for notifying the client, individual caregiver, or agency provider in writing of the overpayment.

The adult services worker **must not** attempt to collect overpayments by withholding a percentage of the overpayment amount from future authorizations or reducing the full amount from a subsequent month.

**DHS-566,
Recoupment Letter
for Home Help**

When an overpayment occurs in the Home Help program, the ASW **must** complete the DHS-566, Recoupment Letter for Home Help, located in the *Forms* module in MiAIMS.

MiAIMS will generate all necessary information to complete this letter. The ASW must supply the following:

- Determine if the recoupment is solicited from the client, individual caregiver, or agency provider.

- The reason for recoupment.

- Warrant details and service period.

- The **exact time period** in which the overpayment occurred.

- The amount of the overpayment.

The overpayment amount is determined by totaling the time associated for each of the tasks not provided. The recoupment is based on the gross amount of payment. If FICA was deducted from the original warrant, it must be deducted from the recoupment. FICA is calculated by multiplying the gross amount of the recoupment by 7.65 percent.

> **Note:** Recoupments for **services provided** prior to April 1, 2022, should follow the previous recoupment process unless the client or caregiver provided additional information to justify a different calculation for the recoupment.

> Example: Client receives personal care services two days a week and was home on both days to receive services.

Consider the following points when completing the DHS-566:

- If the overpayment occurs over multiple months and/or multiple warrants, the ASW may complete one DHS-566 to reflect the entire amount to be recouped. MiAIMS allows multiple warrants per recoupment action with a maximum of five warrants per DHS-566.

- Dual-party warrants issued in the Home Help program are viewed as client payments. Any overpayment involving a dual-party warrant must be treated as a client overpayment.

*Exception:* If the client did not endorse the warrant, recoupment must be from the individual caregiver. This may occur if the client is deceased, hospitalized, nursing home admittance, or incarceration. This list is not inclusive.

- Overpayments must be recouped from the individual caregiver or agency provider for single party warrants.

- **When there is a fraud referral, do not send a DHS-566 to the client, individual caregiver, or agency provider**; see ASM 166, Fraud-Intentional Program Violation.

- Warrants that have **not** been cashed are **not** considered overpayments. These warrants must be returned to Treasury and cancelled.

**Distribution of the DHS-566**

Upon completion of the DHS-566, Recoupment Letter, in MiAIMS, once print has been selected, a copy of the DHS-566 is electronically forwarded to the MDHHS Medicaid Collections Unit mailbox at MDHHS-Collections-Unit@michigan.gov.

The ASW sends **two** copies to the individual who owes the money. One copy is for their records and one copy is to return to MDHHS Medicaid Collections Unit along with a check or money order for the overpayment amount.

An electronic version of the DHS-566, Recoupment Letter, is stored in MiAIMS under the *Contacts* module.

**DHS-567, Recoupment Letter for AFC/HFA**

The ASW will complete a DHS-567, Recoupment Letter for AFC/HFA, for Adult Community Placement or home for the aged cases. Follow the same procedure as the DHS-566. The recoupment letter for the Adult Community Placement program is always sent to the adult foster care or home for aged provider.

**Note:** Unlike Home Help, AFC/HFA providers receive a flat rate of $250.92 per month. To determine the overpayment amount, divide

the flat rate by the number of days in the month. Multiple the daily rate by the number of days the provider was not entitled to receive payment.

**DHS-564, Recoupment Letter for APS Payments**

The adult services worker must utilize the DHS-564 when recouping an overpayment for Adult Protective Services. The DHS-564 is in the *Forms* module of MiAIMS. Follow the policy and instructions for completing the form mentioned previously in this item.

**Overpayments Returned to the Local County MDHHS Office**

Overpayments returned to the local county MDHHS office must be forwarded to the MDHHS Medicaid Collections Unit in accordance with ACM 430, Cash Handling-General Policy.

**Example:** An individual caregiver or agency provider serving multiple clients cashes a warrant after discovering the warrant included funds for a client they no longer serve. The individual caregiver or agency provider writes a personal check in the amount of the overpayment and returns it to the local county MDHHS office.

The adult services worker must complete a DHS-566 and forward it to the Medicaid Collections Unit. A copy of the DHS-566 does **not** have to be mailed to the client, individual caregiver, or agency provider since the overpayment was already returned.

**Overpayments Returned to the MDHHS Medicaid Collections Unit**

There are occasions when a client, individual caregiver, or agency provider will return an overpayment directly to the Medicaid Collections Unit (MCU) prior to notifying the adult services worker of the error. In these instances, the MCU will require the adult services worker to complete a DHS-566 Recoupment Letter for the overpayment amount returned to the state.

**Repay Agreements**

All repay agreements for Home Help and Adult Community Placement overpayments are established by the Medicaid Collections Unit.

**Withdrawal of Recoupment**

If a recoupment is rescinded by the adult services worker, the Medicaid Collections Unit **must** be notified in writing via email that the recoupment has been cancelled. The email request should be labeled "rescinding a recoupment" in the subject line.

The ASW must provide the following information when requesting a recoupment be rescinded:

- Client name.
- Client recipient ID number.
- Provider name.
- Provider ID number.
- Amount of recoupment.
- Reason for rescinding the recoupment.

**Note:** The entire amount of the original recoupment must be rescinded.

**Verification of Recoupment**

Upon receipt of the DHS-566, the Medicaid Collections Unit will create a receivable account, so funds are properly tracked and credited.

If the adult services worker needs to verify that an overpayment has been recouped, contact the Medicaid Collections Unit via their email box at MDHHS-Collections-Unit@michigan.gov.

**LEGAL REQUIREMENTS**

Social Welfare Act, 1939 PA 280, as amended, MCL 400.14(1) (p).

**CONTACT**

For questions contact MDHHS-Home-Help-Policy@michigan.gov.

# Exhibit 4

## OVERVIEW

Intentional Program Violation (IPV) occurs when the client, individual caregiver, agency provider, or client's authorized representative intentionally make a false or misleading statement, hides, or misrepresents/withholds facts to receive or to continue receiving benefits. IPV is considered fraud and must be reported to the Michigan Department of Health and Human Services (MDHHS) Office of Inspector General (OIG).

**Client Suspected of Intentional Program Violation (IPV)**

Suspected IPV means an overpayment exists when all three of the following conditions occur:

- The client (or legally responsible party) **intentionally** failed to report information or gave incomplete or inaccurate information needed to make a correct benefit determination.

- The client was clearly instructed regarding his or her reporting responsibilities to the Department.

  **Note:** A signed DHS-390, Adult Services Application instructs the client of their reporting responsibilities. The adult services worker (ASW) must reiterate the client's responsibility to report any changes **within 10 business days** during the client case reviews.

- The client has no apparent physical or mental impairment that limits his or her understanding or ability to fulfill their reporting responsibilities.

An IPV is suspected when there is credible evidence that the client has **intentionally** withheld or misrepresented information for the **purpose** of establishing, maintaining, increasing, or preventing reduction of program benefits or eligibility. In such cases where these conditions exist, the ASW must make a fraud referral to the OIG.

**Example:** The client (or legally responsible party) intentionally reports inaccurate or incomplete information to conduct an accurate comprehensive assessment of need for Home Help services.

**No recoupment action is taken on cases that are referred to OIG for investigation, while the investigation is being conducted.**

**Individual Caregiver or Agency Provider Suspected of Intentional Program Violation (IPV)**

A suspected individual caregiver or agency provider IPV is an overpayment caused by an individual caregiver or agency provider's intentional false billings or intentional inaccurate statements. Examples of individual caregiver or agency provider overpayment that may be an IPV are:

- Failing to bill correctly (intentionally submitting an incorrect invoice).

- Receiving payment for hours when the client was unavailable, such as, but not limited to, hospitalizations, nursing home, or AFC stays.

- Receiving payment for hours when the individual caregiver or agency provider was unavailable and did not provide care.

**Example:** Individual caregiver or agency provider receives and cashes a single party warrant for a time period they were unavailable and did **not** provide care.

An intentional program violation is suspected when there is credible evidence that the individual caregiver or agency provider has intentionally withheld or misrepresented information for the purpose of establishing, maintaining, increasing, or preventing reduction of program benefits or eligibility.

**No recoupment action is taken on cases that are referred to OIG for investigation, while the investigation is being conducted.**

**OIG REFERRAL CRITERIA**

When an adult services worker believes fraud has occurred within the Home Help program, the ASW must make a referral to the

Office of Inspector General (OIG). Prudent judgement should be used in evaluating an overpayment for a suspected IPV.

Consider the following questions when reviewing the case for fraud:

- Does the case record indicate that department staff advised the client of his or her rights and responsibilities?

  **Note:** The DHS-390 instructs clients of their rights and responsibilities; however, the ASW must remind the client, individual caregiver, or agency provider of his or her reporting responsibilities at each case review.

- Does the case contact in MiAIMS reflect the client's acknowledgement of these rights and responsibilities?

- Did the client, individual caregiver, or agency provider neglect to report timely when required to do so after being informed of their responsibility to report?

- Did the client, individual caregiver, or agency provider make false or misleading statements?

- Does the client, individual caregiver, or agency provider error meet suspected IPV criteria?

**Home Help Fraud/IPV Scenarios**

The following scenarios are provided as guidance for when a Home Help fraud referral should be made to the Office of Inspector General:

- Client alters or forges the DHS-54A, Medical Needs form in order to become eligible for services.

- Client forges the individual caregiver signature on a dual-party warrant and services were **not** provided.

  **Note:** If the client forges the individual caregiver's signature on a dual-party warrant and services **were** provided, this becomes a civil matter and should **not** be referred to OIG.

- Client, individual caregiver, or agency provider has an arrangement to split the warrant and services were **not** provided.

- Individual caregiver reports earnings indicated on their W-2 are inaccurate and the ASW discovers services were not provided.

- Agency provider reports earnings indicated on their 1099 are inaccurate and the ASW discovers services were not provided.

**Example:** Individual caregiver asserts they ended services on a specific date, but the warrants continued to be cashed under their name.

- Client fails to disclose changes that would affect their eligibility or cost of care and was clearly instructed regarding their reporting responsibilities.

**Example:** Client gets married and the spouse is able and available to provide care.

**Example:** Client's health improves and they fail to report the change in care needs.

**Example:** Client fails to disclose others living in the home which would affect the proration of instrumental activities of daily living (IADLs).

- The individual caregiver or agency provider cashes the warrant when the client was unavailable.

**Example:** Client was admitted into a nursing facility and the individual caregiver or agency provider continued to cash the warrant(s).

- The individual caregiver or agency provider continues to receive and cash warrants after the client's death.

- A pattern exists of continued improper billing even after the ASW has repeatedly reviewed reporting and billing procedures with the client, individual caregiver, or agency provider.

**Example:** An individual caregiver or agency provider has multiple instances of billing for services during a client's hospitalization even after discussion with the ASW about proper billing procedures and recoupments for overpayment.

If the ASW questions the appropriateness of a referral, it should be forwarded to OIG who will determine whether to investigate.

## Making a Referral to OIG

The ASW must refer all suspected cases of fraud/IPV in the Home Help program to OIG using the DHS-1131, Medicaid Services Fraud Intake Form. Complete the DHS-1131 and provide copies of all supporting documentation that would assist in the investigation.

Email the DHS-1131 and supporting documentation to the OIG Fraud Complaint mailbox at:

MDHHS-OIG-InvestigativeSupport@michigan.gov

The adult services worker will be notified if a referral is denied for investigation.

**No recoupment action is taken on cases that are referred to OIG for investigation, while the investigation is being conducted.**

## Threshold

Individual caregiver or agency provider fraud has **no** threshold and should be reported to OIG. An individual caregiver or agency provider IPV overpayment of $500 or greater is a felony.

Client suspected IPV has a threshold of $500. A referral to OIG must be made if the total overpayment is **less** than $500, **and** one of the following conditions exists:

- The client has a previous IPV, **or**

- The client has had at least two client errors previously, **or**

- The alleged fraud is committed by a state government employee.

If the overpayment is less than $500 and does not meet the conditions above, refer to ASM 165, Overpayment and Recoupment Process.

## OIG RESPONSIBILITIES

The MDHHS Office of Inspector General is the sole contact point for all fraud referrals pertaining to the Home Help program and the investigation will be assigned based on the investigation type (client, individual caregiver, or agency provider).

**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Referrals are made to the Attorney General (AG) Medicaid Healthcare Fraud Division for prosecution when there is credible evidence of fraud that exceeds $4000.

### Action Taken by OIG

Within 12 months OIG will:

- Refer suspected IPV cases that meet the criteria for prosecution to the prosecuting attorney or AG's office.

- Refer suspected IPV cases that meet the criteria for IPV administrative hearings to the Michigan Office of Administrative Hearings and Rules (MOAHR).

- Return all non-IPV client cases to the adult services worker to initiate recoupment.

- Pursue recoupment for non-IPV individual caregiver or agency provider cases. A DHS-566, Recoupment Letter, is sent to the individual caregiver or agency provider with a copy to MDHHS Medicaid Collections Unit and the adult services worker. **No further action is required by the adult services worker.**

  **Note:** OIG will not send a copy of the recoupment letter to the local county MDHHS office if the case is closed.

**IPV Hearings**

OIG shall request an IPV hearing when there is no signed DHS-4350, Intentional Program Violation Repayment Agreement obtained and correspondence to the client is returned as undeliverable, or a new address is located.

The Department may request a hearing to:

- Establish an intentional program violation against the client.
- Establish a collectable debt (client debt).

**HOME HELP INDIVIDUAL CAREGIVER OR AGENCY PROVIDER SUSPENSION**

Pursuant to federal law, codified at 42 CFR 455.23, a state Medicaid agency must suspend all Medicaid payments to an

individual caregiver or agency provider after the agency determines there is a credible allegation of fraud for which an investigation is pending under the Medicaid program against an individual caregiver, agency provider, or entity, unless there is good cause not to suspend.

The MDHHS OIG will notify the Home Help Policy Section when a credible allegation of fraud is evident against a Home Help individual caregiver or agency provider. The Home Help Policy Section will contact the local MDHHS office and instruct the ASW to suspend the payment authorization(s). The MDHHS Provider Enrollment unit will be notified to terminate or suspend the individual caregiver, agency provider, or agency caregiver eligibility in CHAMPS. OIG will inform the local office and the policy section if the individual caregiver, agency provider, or agency caregiver suspension is lifted.

## RECOUPMENT

**No recoupment action should be taken on cases that are referred to OIG for investigation until notified.**

OIG will notify the referring adult services worker of non-IPV substantiated cases of client fraud. The ASW will be responsible for initiating the recoupment.

OIG will initiate recoupment on individual caregiver or agency provider fraud cases investigated but denied for prosecution. OIG will send the individual caregiver or agency provider a recoupment letter and forward a copy to the MDHHS Medicaid Collections Unit for recoupment. **No further action is needed by the adult services worker.**

## FRONT END ELIGIBILITY (FEE)

The Office of Inspector General established the Front End Eligibility (FEE) program in response to the need for fraud prevention. The goal of the FEE program is to obtain and maintain a partnership between the MDHHS local office staff early in the eligibility determination process in order to reduce errors.

### FEE Referral

The adult services worker may request a pre-eligibility investigation by the OIG regulation agent when it is believed the client is intentionally misrepresenting the need for Home Help services.

Referrals for FEE are also accepted for open cases when it is believed a client is misrepresenting the need for continued care.

Examples of an appropriate FEE referral for Home Help services would be the following:

- A Home Help case is denied due to a spouse (responsible relative who is **able** and **available**) in the home and the client later reapplies claiming the spouse has moved out of the home.

- The ASW suspects the client and individual caregiver, agency provider, or agency caregiver of Home Help are married to one another and they are not disclosing their marital status.

- The client indicates they live alone either verbally or on the DHS-390, Adult Services Application, but Bridges shows others living in the home.

- Client's medical condition improves, and fewer services are needed, but the client, individual caregiver, or agency provider fails to report the change.

### *Components of a Quality FEE Referral*

The following are components of a quality FEE referral:

- The case should be active or pending for benefits.
- Ensure that policy supports why the client may not be eligible.
- Provide accurate case demographics.
- Attach all supporting documentation.

To make a FEE referral from the Inside MDHHS website, use the following path: Inside MDHHS > About > Offices and Departments > Office of Inspector General > FEE Referral/Instructions, and complete the FEE Referral Form.

OIG regulation agents must complete the investigation within 10-business days and respond to staff with their findings. Investigations are completed prior to opening the case or recertifying the applicant for benefits.

**CONTACT**

For questions contact MDHHS-Home-Help-Policy@michigan.gov.

# Exhibit 5



STATE OF MICHIGAN
DEPARTMENT OF HEALTH AND HUMAN SERVICES
Lansing

GRETCHEN WHITMER
GOVERNOR

ELIZABETH HERTEL
DIRECTOR

## REPAYMENT AGREEMENT

This Agreement, effective upon execution by the parties, is made between the Michigan Department of Health and Human Services Office of Inspector General (MDHHS OIG), and First Alliance Home Care, L.L.C., with its resident agent located at 24001 Southfield Rd., Ste. 103, Southfield, MI 48075 (hereinafter "Provider"), and Kerisha Henderson (formerly "Williams"), owner, residing at 23898 Barfield St., Farmington Hills, MI 48336 (hereinafter "Owner").

The Michigan Department of Health and Human Services (Department) has been designated as the single state agency to administer the Medical Assistance (Medicaid) Program established under Title XIX of the Social Security Act, 42 USC 1396, et seq, and administered under 1939 P.A. 280, as amended, 105 et seq.

Provider is enrolled with the Department in Medicaid to provide home help services to eligible Medicaid beneficiaries and, at the time of the review, was eligible to receive reimbursement for these services through the following identification number: ▇▇▇▇▇.

The MDHHS OIG recently reviewed Provider's Medicaid claims, Case No. ▇▇▇▇▇▇ ▇▇▇▇▇ attached hereto as Exhibit A. As a result of a review of claims paid by the Department, it has been determined that the Department has made payments to Provider in excess of the reimbursement to which it was entitled in the amount of $22,401.04 (with a current balance of $6,840.13) (hereinafter "Case No. ▇▇▇▇▇▇ or "Overpayment").

Provider, Owner, and the MDHHS OIG have agreed to settle Case No ▇▇▇▇▇▇▇ under the terms and conditions in this Agreement. The obligation of MDHHS OIG to consummate this Agreement is subject to and conditioned on the satisfaction of all the terms and conditions of

this Agreement to be complied with and performed by Provider and/or Owner and subject to the following conditions:

## ARTICLE I

**Settlement Amount:**

1. Provider and Owner agree to repay $6,840.13, in addition to accruing interest, as described in Article I (hereinafter "Settlement Amount").

**Payment and Interest Rate:**

2. Except as provided in Article I, Section 6, prior to complete payment of the Settlement Amount ($6,840.13, plus any accruing interest), the outstanding principal balance of the Settlement Amount (i.e., the total amount that has not been repaid to date) shall bear an interest equal to 5.22% per annum (hereinafter "Annual Interest"). The Annual Interest shall be payable monthly in arrears on the 1st day of each month in accordance with Exhibit C attached hereto. Any change in the interest rate on the Settlement Amount resulting from a Default, as defined in Article I, Section 6, shall become effective as of the opening of business on the date of such Default. In the event of Default, Exhibit C will be subject to change to account for the statutory judgment interest, as described in Article I, Section 6.

3. Provider and Owner agree to pay the Settlement Amount of $6,840.13, plus accruing interest, by paying 37 consecutive monthly installments of $200.55, inclusive of principal and interest, in accordance with Exhibit C. The first installment is due on August 1, 2024. Each subsequent installment is due on the 1st day of each following month.

4. At any time while not in Default under this Agreement, Provider or Owner may prepay the outstanding principal balance of the Settlement Amount, in full or in part, along with any accrued and unpaid interest, without notice or penalty.

5.      Payments must be made by check or money order (do not send cash) and made payable to the **"State of Michigan."** All payments must contain the provider Tax ID number(s) and "OIG Overpayment" in the notes section of the instrument and be mailed to:

> MDHHS Central Cashier Office
> OIG Integrity Division
> P.O. Box 30437
> Lansing, MI 48909

**<u>Default:</u>**

6.      The Department has allowed this debt to be repaid via an installment plan over 37 months. Provider and Owner must remain current at all times under the repayment plan. If the total amount due is not paid within 37 months according to the schedule detailed in Article 1, and/or if Provider or Owner fails to tender the monthly payment check within 21 calendar days after the date on which it is due, then the total remaining Overpayment (plus any accruing interest) will be immediately due and payable, and Provider and Owner will be deemed to be in default. The outstanding Overpayment (of $6,840.13, plus any accruing interest) will be reinstated and immediately due and payable at once, without demand or notice, in accordance with the COGNOVIT RELATING TO REPAYMENT AGREEMENT, attached hereto as Exhibit B. The Department may use any legal recourse to recover the unpaid Overpayment balance plus statutory judgment interest as defined under MCL 600.6013, costs, and reasonable attorneys' fees from Provider or Owner, including referral of the debt to the Michigan Attorney General or the Michigan Department of Treasury for further collection.

## ARTICLE II

Receipt of the $6,840.13 payment, plus interest, within the terms of this Agreement is a condition precedent to full and final settlement of all civil liability for Provider and/or its owner(s), employees, and/or agents for Case No. ▮▮▮▮▮▮▮▮ Notwithstanding any term of this Agreement, specifically reserved and excluded from the scope and terms of this Agreement as to

any entity or person (including Provider and Owner) are the following claims of the MDHHS OIG,

the State of Michigan, and its agencies:

    i)        Any civil, criminal, or administrative liability arising under Michigan tax law,

                including but not limited to MCL 205 et seq.;

    ii)       Any criminal liability;

    iii)      Except as explicitly stated in this Agreement, any administrative liability, including

                exclusion from state health or dental care programs;

    iv)      Any liability to the State of Michigan (or its agencies) for any conduct, claim,

                transaction, or occurrence other than that covered under Case No. ███████

                █████████;

    v)       Any liability based upon such obligations as are created by this Agreement;

    vi)      Any liability of individuals (including current or former directors, officers,

                employees, or agents of Provider or Owner) who receive written notification that

                they are the target of a criminal investigation, are criminally indicted or charged, or

                are convicted, or who enter into a criminal plea agreement related to Case No.

                █████████

Based on Provider's and Owner's complete and timely repayment under the terms of this

Agreement, the above-referenced case will be closed, and MDHHS OIG will not pursue any

further civil or administrative monetary claim against Provider and/or its owners, employees,

and/or agents with respect to this matter, including but not limited to, any suspension, termination,

or other action respecting Provider's and/or its owners', employees', and/or agents' Michigan

provider license.

Provider and Owner fully and finally release MDHHS OIG, the State of Michigan, its

agencies, employees, servants, and agents from any claims (including attorneys' fees, costs, and

expenses of every kind and however denominated) which Provider or Owner have asserted, could

have asserted, or might assert in the future against MDHHS OIG, the State of Michigan, its agencies, employees, servants, and agents, related to Case No. ███████████ or arising from the State of Michigan's (or its agencies') investigation and prosecution of civil or criminal actions related to Case No ███████████

The Settlement Amount shall not be decreased as a result of a reduction, denial, or any change in determination, whether adverse or beneficial, of claims identified in Case No. ██████████ by any carrier, payor, vendor, or intermediary. Provider and Owner agree not to resubmit, request reconsideration of, or appeal any claims identified in Case N██████████ to any Medicaid carrier, vendor, or intermediary or any state payer.

Provider and Owner agree to waive and not seek payment for any of the claims identified in Case No. ███████████ from any beneficiaries or their parents, sponsors, legally responsible individuals, or third-party payors.

All costs incurred by or on behalf of Provider, its Owner, its present or former officers, directors, employees, shareholders, and agents in connection with the following shall be "Unallowable Costs" on government contracts and under the Medicaid program and other state and federal health or dental care programs:

i)      The matters covered by this Agreement;

ii)     The audit and civil and/or criminal investigation of the matters covered by this Agreement;

iii)    Provider's or Owner's investigation, defense, and any corrective actions undertaken in response to the review and civil and/or criminal investigation in connection with the matters covered by this Agreement (including attorneys' fees);

iv)     The negotiation and performance of this Agreement;

v) The payments Provider or Owner makes to MDHHS OIG, the State of Michigan, and its agencies and any payments that Provider or Owner may make to any individuals related to Case No. █████████

These "Unallowable Costs" shall be separately determined and accounted for by Provider or Owner and shall not be charged directly or indirectly to any contracts with the State of Michigan, its agencies, or any state Medicaid program. Provider and Owner agree not to seek payment for such Unallowable Costs through any cost report, cost statement, information statement, or payment request submitted by Provider or Owner or any of their subsidiaries or affiliates to the State of Michigan, its agencies, or any state Medicaid program.

This Agreement does not waive the right of the Department or the MDHHS OIG from either reviewing Provider or Owner for any other conduct than that which is referenced in Case No █████ █████████ or reviewing any other entity owned or operated by Provider or Owner.

The parties may waive this Agreement only by a writing executed by the party or parties against whom the waiver is sought to be enforced. No failure or delay

i) in exercising any right or remedy, or

ii) requiring the satisfaction of any condition

under this Agreement, and no act, omission, or course of dealing between the parties operates as a waiver or estoppel of any right, remedy, or condition. A waiver made in writing on one occasion is effective only in that instance and only for the purpose stated. A waiver, once given, is not to be construed as a waiver on any future occasion or against any other Person.

## ARTICLE III

No party may assign any of its rights under this Agreement, except with the prior written consent of the other party. That party shall not unreasonably withhold its consent. All assignments

of rights are prohibited under this Article, whether they are voluntary or involuntary, by merger, consolidation, dissolution, operation of law, or any other manner. For purposes of this Article,

i)      a "change of control" is deemed an assignment of rights; and

ii)      "merger" refers to any merger in which a party participates, regardless of whether it is the surviving or disappearing corporation.

No party may delegate any performance under this Agreement, except with the prior written consent of the other party.

Any purported assignment of rights or delegation of performance in violation of this Article is void.

This Agreement shall inure to and be binding on the parties, their respective successors in interest by way of merger, acquisition, or otherwise, and their permitted assigns; provided, however, that nothing contained in this paragraph shall constitute a consent to the assignment or delegation by either party hereto of any rights, duties, or obligations under this Agreement.

## ARTICLE IV

This Agreement cannot be modified in any manner except by an instrument in writing executed by the parties. The individual signing this Agreement on behalf of Provider represents and warrants that the individual is authorized by Provider to execute this Agreement. The MDHHS OIG signatory represents that the signatory is signing this Agreement in the signatory's official capacity and is authorized to execute this Agreement. If any provision of this Agreement is determined to be invalid or unenforceable, the remainder of the Agreement will remain valid and enforceable to the fullest extent permitted by law.

This Agreement shall be governed by the laws of the State of Michigan.

Any party who wishes to bring against the other party a civil action or proceeding arising out of or relating to either this Agreement or the relationship of the parties may bring such action or proceeding only in a state or federal court in Michigan. For this purpose, each party consents to personal jurisdiction in such state or federal court and waives any right to dismiss or transfer such action or proceeding because of the inconvenience of the forum. Nothing in this section shall prevent enforcement in another forum of any judgment obtained in a court in Michigan.

## ARTICLE V

This Agreement and the attached Exhibits, incorporated by reference and made an integral part of this Agreement, constitute the entire agreement between the parties and supersede any prior written or oral agreements between the parties regarding the subject matter of the Agreement. Each party to this Agreement acknowledges that no representations, inducements, promises, or agreements, oral or written, have been made by any party, or anyone acting on behalf of any party, other than those embodied in this Agreement, and that no other agreement, statement, or promise not contained in this Agreement shall be valid or binding.

Provider and Owner have read this Agreement in full and have a complete understanding of its terms and implications; and further, the Agreement is signed voluntarily and without coercion. A fully executed copy will be forwarded to Provider and Owner upon execution of this Agreement by the parties.

## ARTICLE VI

**Personal Guaranty:**

Owner, Kerisha Henderson, hereby unconditionally and personally guarantees the payment of all Provider's indebtedness under this Agreement in her individual capacity. Owner, Kerisha Henderson, as Personal Guarantor, agrees to pay the obligations of Provider under this Repayment Agreement if Provider fails to meet its obligations hereunder.

The signatures on this page relate to the Repayment Agreement entered between the Michigan Department of Health and Human Services Office of Inspector General ("MDHHS OIG"), First Alliance Home Care, L.L.C., and Kerisha Henderson, regarding MDHHS OIG Case No. █

FIRST ALLIANCE HOME CARE, L.L.C., BY ITS OWNER, KERISHA HENDERSON:

Dated: 7/30/2024        By: _____

Title: Owner

Kerisha Henderson
Owner, Jointly and Severally
First Alliance Home Care, L.L.C.
24001 Southfield Rd., Ste. 103
Southfield, MI 48075

KERISHA HENDERSON IN HER INDIVIDUAL CAPACITY:

Dated: 7/30/2024        By: _____

Kerisha Henderson, Individually
23898 Barfield St.
Farmington Hills, MI 48336

MICHIGAN DEPT OF HEALTH & HUMAN SERVICES OFFICE OF INSPECTOR GENERAL:

Dated: 7/31/2024        By: _Stacie Sampson_____

Stacie Sampson
Inspector General
Michigan Dept of Health & Human Services
Office of Inspector General

# Exhibit 6

Approved, SCAO

| STATE OF MICHIGAN | | |
|---|---|---|
| **JUDICIAL DISTRICT** | **JUDGMENT** | **CASE NO.** |
| 30th **JUDICIAL CIRCUIT** | Civil | 25-002106-CZ |

The Honorable Rosemarie Aquilina

**Court address**
Veterans Memorial Courthouse, 313 W, Kalamazoo St., Lansing, MI 48901

**Court telephone no.**
(517) 483-6500

| Plaintiff(s) | | Defendant(s) |
|---|---|---|
| State of Michigan - Dept of Health & Human Services, Office of Inspector General | v | First Alliance Home Care, L.L.C., and Kerisha Henderson |

**Plaintiff's/Plaintiff's attorney name, address, and telephone no.**

Stephanie L. Seery (P73408)
Michigan Department of Attorney General
P.O. Box 30754 Lansing, MI 48909
Phone: 517-335-7584

**Defendant's/Defendant's attorney name, address, and telephone no.**

N/A

☑ **JUDGMENT**

For: Plaintiff

Against: Defendants

☐ Trial   ☑ Consent
☐ Summary Disposition   ☐ Default*

☐ **DISMISSAL**
☐ Without prejudice   ☐ With prejudice
☐ No cause of action

*For a defendant on active military duty, default judgment shall not be entered except as provided by the Servicemembers Civil Relief Act.

## ORDER OF JUDGMENT NOT INCLUDING STATUTORY INTEREST

Damages: $ 6,037.93

Costs (fees): filing $ 150.00 jury $ 0.00 motion $ 0.00 service $ 0.00

statutory $ 0.00 (MCL 600.2441) $ 150.00

Attorney fee: ☐ statutory ☑ other (specify) $249.51 (accrued contractual interest) $ 249.51

Total judgment amount (This judgment will earn interest at statutory rates, computed from the filing date of the complaint.): $ 6,437.44

☐ The defendant shall pay the judgment in installment payments of $ _____ each _____ starting _____ until the judgment is paid in full. The plaintiff shall not issue a periodic garnishment as long as payment is made.
Other conditions, if any:

☐ Approved as to form, notice of entry waived.
**IT IS ORDERED** that this judgment is granted.
This judgment resolves the last pending claim and closes the case unless checked here. ☐

**MAY - 6 2025**
Judgment date

/s/ Stephanie L. Seery (P73408)
Plaintiff/Attorney

Judge/Court Clerk

Bar no.

JUDGE ROSEM ... RY AQUILINA P37670
Defendant/Attorney

Judgment has been entered and will be final unless a motion for new trial or an appeal is filed within 21 days after the judgment date.

## STATUTORY INTEREST

The judgment interest accrued from the filing of the complaint to judgment is $ 0.71 and is based on:
(If additional rates apply, attach a separate sheet.)
☑ the statutory rate of 4.016 % from 04/22/2025 to 04/23/2025 .
☐ the statutory 6-month rate(s) of _____ % from _____ to _____ and
_____ % from _____ to _____ .

**CERTIFICATE OF MAILING** I certify that on this date I served a copy of this judgment on the parties or their attorneys by first-class mail addressed to their last-known addresses as defined by MCR 2.107(C)(3).

Date

Signature

MCL 600.2441, MCL 600.5759, MCL 600.6013, MCL 600.8375, MCR 2.601, MCR 2.602, MCR 2.603, 50 USC App 521